THE STATE OF CONNECTICUT *vs*. CHIN LUNG ET AL.

*First Judicial District, Hartford, October Term, 1927.*

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

The law as to setting aside verdicts and granting new trials is the same in criminal as in civil causes.

If a verdict is one which twelve honest men, acting fairly, intelligently and reasonably, might have rendered, it cannot be disturbed; but if it does manifest injustice and is so palpably against the evidence as to indicate that the jury must have made some mistake in the application of legal principles or were influenced by lack of knowledge or understanding, or by corruption, prejudice or partiality, it will be set aside, even though there was conflicting evidence.

The ruling of a trial judge upon a motion to set aside a verdict is entitled to great weight and every reasonable presumption must be resolved in its support, for such action involves the exercise of a legal discretion which will be sustained unless clearly abused.

Section 6633 of the General Statutes provides that no person shall be convicted of any crime punishable by death, without the testimony of at least two witnesses or that which is equivalent thereto. *Held* that under this statute it was not necessary that there should be two or more witnesses to every fact constituting an essential element of the capital offense, but that

it was sufficient if there were two or more witnesses each testifying to different parts of the same transaction, or to different circumstances attending it, and all concurring to prove the crime charged, although there might not be two witnesses to any one fact.

Upon appeal from the denial of a motion to set aside a verdict of guilty of murder in the first degree, the function of this court is to determine whether the jury might reasonably have found that the evidence established beyond a reasonable doubt and by the testimony of at least two witnesses or its equivalent, the guilt of the accused as charged.

The evidence in the present case reviewed and *held* to support the verdict of the jury that the defendant Chin Lung, as principal, and the defendant Soo Hoo Wing, as accessory, were guilty of murder in the first degree.

Flight by an accused from the scene of a crime, and misstatements by him concerning it, though not conclusive of guilt, are clearly admissible as tending to prove it.

An appeal from the denial of a plea to the jurisdiction, or a motion to quash, or a challenge to the array, requires a finding of facts by the trial court; a mere transcript from the evidence of what took place at the trial concerning such matters is not sufficient.

Section 5688 of the General Statutes provides for the drawing of the first panel of jurors before the opening of a jury term and summoning of them for service. *Held* that the drawing may be dispensed with if there is no business for the jury, or the summoning deferred until it is known that jurors will be needed for the trial of cases.

The failure to summon the first panel before additional jurors are drawn and summoned under § 5691 of the General Statutes, is a defect within the fair intendment of the provision of § 5692 that "no verdict shall be set aside on account of any irregularity in summoning the jury," but could not, in any event, be made ·the basis for a new trial where, as in the present case, it does not appear that the appellant was in any way prejudiced thereby.

When an accused is under confinement charged with a crime punishable with death or life imprisonment, the State's Attorney should notify the court, whose duty it then is to order a grand jury.

The Superior Court has jurisdiction of all criminal cases of which exclusive jurisdiction is not conferred upon some other court, and the State's Attorney may file an original information therein except in cases punishable with death or life imprisonment.

In the present case, the accused were bound over without bail on March 24th by the Town Court of Manchester to the June Term

of the Superior Court in Hartford County, and committed to jail under a mittimus issued by the lower court. On March 29th they were indicted by a grand jury, and thereafter, having been arrested upon a bench warrant issued by the Superior Court, were brought before the March term of that court for trial. *Held* that this procedure was a lawful and effective method of bringing the accused to a speedy trial.

When the presence of an interpreter, or of a magistrate to administer oaths to the witnesses, is necessary to the proper functioning of a grand jury, he may be admitted to their proceedings, provided he is sworn to secrecy and permitted to remain in the jury room only during the performance of the duties for which he is called.

The accused claimed that the trial court erred in denying their motion for a mistrial because of the mental and physical incapacity of two of the jurors. *Held* that this claim was without merit in view of the finding that the jurors were not incapacitated for duty; and that the action of the trial court in adjourning the trial, and in holding the jury, for a period of ten days during the illness of one of them, was a wise and considerate exercise of its discretion.

Claims not made in the trial court will not be considered by this court upon appeal.

Finger-print evidence, when competent, relevant and material, is admissible to establish the identity of an accused.

Argued October 5th—decided October 26th, 1927.

INDICTMENT charging the accused jointly with the crime of murder in the first degree, brought to the Superior Court in Hartford County and tried to the jury before *Jennings, J.;* verdict and judgment of guilty, and appeal by the accused. *No error.*

*Homer S. Cummings* and *Frank E. Healy,* with whom was *Francis P. Rohrmayer,* for the appellants (the accused).

*Hugh M. Alcorn,* State's Attorney, with whom was *Reinhart L. Gideon,* Assistant State's Attorney, for the appellee (the State).

WHEELER, C. J. We will first consider the motion to set aside the verdict and then take up the several

interlocutory rulings made in the course of the trial. Under the rule prevailing in this jurisdiction, we examine and test the evidence in the same way the jury should have done in reaching its verdict. If we find it to be one which twelve honest men, acting fairly, intelligently and reasonably, might have rendered, we cannot set it aside. If, on the other hand, we find it does manifest injustice, and is so palpably against the evidence as to indicate that the jury must have made some mistake in the application of legal principles, or were influenced by lack of knowledge or understanding, or by corruption, prejudice, or partiality, we will set it aside. *State* v. *Schutte,* 97 Conn. 462, 464, 117 Atl. 508; *Howe* v. *Raymond,* 74 Conn. 68, 71, 49 Atl. 854; *Brooks' Appeal,* 68 Conn. 294, 296, 297, 36 Atl. 47; *State* v. *Buxton,* 79 Conn. 477, 480, 65 Atl. 957. Our rule in the criminal case is the same as in the civil. When the manifest injustice of the verdict is so plain as to justify the belief that the jury or some of its members were influenced by ignorance, prejudice, corruption or partiality, the verdict will be set aside even though there was conflicting evidence. "Clearly," we say in *Roma* v. *Thames River Specialties Co.,* 90 Conn. 18, 20, 96 Atl. 169, "the action of a jury may be as unreasonable, and as suggestive of being produced by improper influences, in passing upon the credibility of witnesses and in the weighing of conflicting testimony, as in any other respect."

Two considerations must be kept before the court before we can set aside a verdict. Great weight must be given to the ruling of the trial court, and all reasonable presumptions resolved in its support. *Uncas Paper Co.* v. *Corbin,* 75 Conn. 675, 677, 55 Atl. 165. It must be remembered that the trial judge "was acting in the exercise of a legal discretion, and his action is not to be disturbed by us unless it clearly appears

that the discretion was abused." *Roma* v. *Thames River Specialties Co.*, *supra*, p. 20. "The question never is whether this court, upon the evidence in a cause, would come to the conclusion reached by the jury, but it is rather whether that conclusion is manifestly an unreasonable one under all the circumstances; such an one as no jury, acting fairly and reasonably, would be likely to reach on the evidence." *Brooks' Appeal*, *supra*, p. 296. Our rule means this—"the verdict will not be disturbed if there is any reasonable ground appearing in the evidence on which the jury might have acted." *Loomis* v. *Perkins*, 70 Conn. 444, 446, 39 Atl. 797. We not only require the guilt of the accused to be affirmatively proven by the State beyond a reasonable doubt, but General Statutes, § 6633, provides that "no person shall be convicted of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto." The meaning of this statute was settled by judicial construction at an early time. " 'By this statute the testimony of one witness swearing either directly or to circumstances, is not enough to convict of murder in the first degree. It must be the testimony of two witnesses, or that which is equivalent thereto. This does not mean that there must be two witnesses to every fact or circumstance constituting the same. If there be two or more witnesses, each testifying to different parts of the same transaction, or to different circumstances attending it, and all concur to prove the crime alleged, this may be sufficient to warrant a conviction though there should not be two witnesses to any one fact.' " *State* v. *Schutte*, 97 Conn. 462, 465-469, 117 Atl. 508. The denial of the motion to set aside the verdict, as we said in *State* v. *Chapman*, 103 Conn. 453, 457, 130 Atl. 899, "is to be tested by determining whether the jury might reasonably have

found that the evidence established beyond a reasonable doubt the guilt of the accused as charged with the commission of the crime of murder in the first degree and by evidence equivalent to that of two witnesses."

For the proper application of this rule we have reviewed the evidence with great care and made every reasonable allowance for the comparative unfamiliarity of these accused with our language, customs and life. The jury might reasonably have found from the evidence offered by the State that the accused Chin Lung, whom we shall hereafter designate as Chin, was seen on the day before the homicide on Main Street in Manchester, going in the direction of Oak Street and about five hundred and fifty feet from the laundry of Ong Jing, who had done business in Manchester for fourteen years and was known as Sam, as we shall hereafter designate him. On the next morning, March 24th, by arrangement made the evening before, Soo Hoo Wing, whom we shall hereafter designate as Soo, waked Chin at 5:45 o'clock and together they walked to City Hall Square, Hartford, where Soo engaged a taxi to take them to the Union station, Soo paying the fare. Outside the station Chin passed a taxicab whose windows exposed to view those in the rear seat and came to a taxi whose windows did not expose those in the rear seat to view and, at the suggestion of Soo, caused its horn to sound; the driver came, Chin got in the taxi and, by his direction, drove across the street to get Soo, who stood on the curb reading a newspaper. Soo arranged with the driver to take them to Manchester and back to Hartford and thence to Meriden for $15. When they reached Manchester the driver, by direction of Chin, drove down Main Street until Chin tapped on the front glass with the newspaper to attract the driver's attention and directed him to turn around; when he reached Oak

Street, in response to a like tapping, the driver stopped at the corner. The newspaper used was that which Soo had been reading on the curb. Chin and Soo alighted and proceeded up the north side of Oak Street, on which the laundry of Sam was located, about five hundred feet distant. After passing a store they stopped, about sixty-eight feet from the laundry, and conversed. Soo then came back and said to a man standing in a doorway and about one hundred and twenty-eight feet from the laundry, "Any customers"; upon receiving a negative reply, Soo joined Chin and they proceeded to the door of the laundry and Chin rapped, but no one came to the door. Soo then returned to the taxi, which had been driven across Main Street and was headed toward Hartford, and out of the vision of persons on Oak Street, and saying he was cold, got in the taxi. After Soo left, Chin rapped again and Sam came to the door and admitted him and he at once asked for money. On Sam refusing, Chin asked for Ong Ging Hem; being told he was in bed, Chin asked Sam to call him, who told Chin to call him himself. Chin went to the door of the bedroom and told Ong Ging Hem to get up, which he did, put on his shirt and trousers and went into the lavatory located off the washroom, which was in front of the bedroom and in the rear of the ironing room behind the office. The laundry was a one-story building, 38 x 19 feet, and comprised these four rooms. Sam heard Ong Ging Hem get up, heard him while in the lavatory and knew when he came from it. Almost immediately thereafter Sam heard three sounds, like bang, bang, bang, then Chin came to the room where Sam sat by the stove, pointed a revolver at him and cried out, "Don't you move. If you move your hand I will kill you," and rushed to the front entrance and, as he was leaving, shouted that Ging Hem was a member of the

Hip Sing Tong, a Chinese society. Sam in fresh pursuit ran out of the laundry close after Chin and yelled at a shoemaker nearby, "Shot my cousin, Chinaman, catch him." Both chased Chin up Oak Street to Main Street and lost him there. Sam returned to the laundry with a tailor from a nearby store, and upon the floor just outside the lavatory Ong Ging Hem lay dead in a pool of his own blood. The officers took possession of the laundry almost at once and thereafter held possession of it, finding in it no indication of a struggle. The chief of police sent for the county detective, and not long after both left for Hartford, taking Sam with them; at the Union station they found the driver of the taxi which had taken the accused to Manchester, and thence proceeded to Meriden, and then to New Haven, taking the taxi driver as well as Sam with them. When Chin disappeared around the corner of Oak and Main streets he boarded his waiting taxi, and by Soo's direction the driver started for Hartford and continued on to Meriden, where they discharged this taxi, and shortly Soo engaged another taxi of a different color nearby to take them to New Haven for $8. As they drove down Ferry Street in New Haven a traffic officer, who had been instructed to arrest two Chinamen in a taxicab of a different number, arrested the accused and took them afterward to headquarters. At first they refused to say whether they came from Hartford, later Chin told the officers he lived in Hartford, had arisen that morning at eight o'clock and he and his friend started for New Haven looking for work. When asked about the shooting in Manchester he refused to talk. Later in the morning Sam was brought to headquarters and accused Chin of shooting his cousin, but Chin made no response. The taxicab driver there identified the two Chinamen as those he had taken to Manchester and Meriden, but

The State *v.* Chin Lung.

they did not admit it. Four days later both accused said they had not been to Manchester on the morning of the homicide; when asked if they had any part in the killing both said they had nothing to say. When these officers returned to the laundry they found the newspaper Soo had been reading just before Chin and Soo started for Manchester and the same newspaper Chin had used to arrest the attention of the taxi driver so that he might direct him to turn around and then to stop, lying on the floor near the body of Ong Ging Hem covered with blood. A little later one of the officers asked Sam if he had a gun, he at once said he had, and they went to the place where he said it was, and found it in a box at the head of his bed. It was a new thirty-eight caliber Colt revolver and had never been fired. Another officer found a thirty-two caliber Smith and Wesson revolver with barrel down and the stock sticking out, among some papers in a box open at the top and under a counter which was almost flush with the door of the ironing room, which was the only exit from the laundry. Two bullets were found in the lavatory, which the uncontradicted testimony of the State's experts agreed had been fired from this revolver and had passed through the body of Ong Ging Hem and caused his instantaneous death.

The State offered in evidence photographs of the revolver and enlarged photographs of the finger prints found thereon. Two experts testified that a finger print found on the barrel of the Smith and Wesson revolver, when compared with the finger prints of Chin and Soo, was found to be that of the left middle finger of Soo, but that no finger print of Chin was found on this revolver.

The defense offered the testimony of the accused and of Chung Tom. Chin testified that he had been in the Chinese grocery business in Hartford with Sam and

Chung Tom and that the business had been discontinued and no accounting of it made by Sam, who said the books had disappeared from a trunk. For the return of these books Sam and Chin offered a reward of $25. A month before his arrest he had been to Manchester and demanded of Sam the money he had invested in the business and Sam then paid him $15. Ong Ging Hem told him the books were in the laundry and that Sam usually went out Wednesday nights and remained in Hartford over night and to come before eight a. m. on Thursday and get the books. Accordingly he went to Bristol and arranged with Chung Tom to meet him at the Union station, Hartford, and go out with him to get the books; that he took Soo with him to the station to ask about trains and help him, as he could not speak English well and wanted Soo to do the talking for him. Missing meeting Chung Tom, he had taken Soo along to Manchester to do the talking for him and taken a taxi in order to bring the books back to Hartford. His statement does not differ from that presented in evidence by the State, except that he denies the taxicab driver's statement that arrangement was made at the station to take them to Manchester and thence to Meriden, for $15, and says that the arrangement was to take them to Manchester and return only, for $5. He agrees with the State as to the course of the taxi in Manchester and as to its stopping. His explanation of why the taxi stopped over five hundred feet from the laundry, was that he had not expected the driver to stop, but, as he had stopped, he thought they had better get out and walk. Both accused agree that they went together to the laundry and rapped and that then Soo left the laundry to go to the taxi. He also testified that they started to return and had gone about twenty feet when he said to Soo, "We came . . . for those books. I am

going back and rap again," and Soo said, "It's too cold. I am going back to the car to get warm." He agrees, in substance, with Sam's statement up to the point where Ong Ging Hem arose and partly dressed. He then says: "I asked Ong Ging Hem where the books were," but he told me quietly "to get them another time." Sam then rushed in the room and said, "What's the idea," and I said, "Ong Ging Hem told me the books were here." Sam began scolding Ong Ging, who said the books were there, and Sam then said, "What business of yours where the books are." "Ong Ging said, the books are here, Sam is not paying me what he owes me, and is trying to cheat you too out of your money. Sam then grabbed a gun and shot him a couple of times, and I grabbed the gun Sam had, pushed it aside, and ran out of the laundry in fear, and went thence to the taxi. Chin denies saying, as he ran out, anything about the Hip Sings. As he got in the car he told Soo, "Sam had killed Ong Ging Hem." Soo told the driver to go home. When they passed over the Hartford bridge he says "We arranged with the driver to go to Meriden for ten dollars." He denies he shot Ong Ging Hem, or ever had in his possession that morning the Smith and Wesson revolver in evidence.

On cross-examination Chin testified he had arranged with Soo to go down to the Union station with him, and whichever waked up first would call the other. Next morning Soo called him at 5:45. He went in a taxi, so that he could bring the books back. He denied the statement of the State's witness that on the way to the laundry they stopped and Soo came back and talked to someone and then they went on. He testifies Sam fired two shots at Ong Ging Hem, and as he held the gun he fired another shot. He explains his leaving Manchester without giving notice of the killing

of Ong Ging Hem and going on to Meriden and then to New Haven, because he'd seen a man killed and he was afraid and wanted to get away from there. He explains his traveling in the taxicab instead of the train by the fact that he wanted to get away and did not know when the next train went. He explains his contradictory statements to the officers through his fear, which made him make any kind of a statement. Soo, in most particulars, corroborates Chin as to what occurred in his presence, and testified he never saw the Smith and Wesson revolver and never had this revolver in his hands. He also testified that when Chin told him that Sam had killed Ong Ging Hem, he said to him, "We had better get away as far as we can," and, "If I knew such a thing was going to happen, I would never have went with you." Chung Tom, testifying for the accused, said he had been in the Chinese grocery business with Sam and Chin and had put in the business $600 and received nothing for it, and on the evening of March 23d Chin came to him in Bristol and asked him to go to Manchester with him the next morning for the purpose of getting the books; that he came as he had promised, but missed seeing them and returned home. Chin and Sam were the only persons in the laundry when Ong Ging Hem was killed by the two bullets fired from the Smith and Wesson revolver as he was facing toward the south and just outside the lavatory. Chin is seen hurrying down Oak Street a short distance from the laundry, and at this very time Sam yells his accusation and chases after him. Upon the floor, near the body, is found the newspaper which Chin, shortly before he entered the laundry, admittedly had. It is covered with the blood of the dead man lying on the floor. These facts are incontestable. Sam says the revolver from which the fatal shots were fired is not his; he tells the officers where he kept his re-

volver, there they find it, and the experts find no bullet has ever been fired from it. The jury might reasonably have found that the revolver from which were fired the fatal bullets was not Sam's revolver, and that his prompt accusation of Chin, his identification of him, his persistence in his accusation, and his entire conduct, furnished no indication of guilt, but did indicate regret at and resentment for the death of his cousin.

Chin's accusation against Sam as the author of this tragedy is disproved by the mute witness upon the floor near the body—the bloody newspaper. If Sam left his seat by the stove and rushed in the room, as Chin says, crying, "What's the idea," and is told by Ching, "Ong Ging Hem says the books are here," and in his rage at the disclosure Sam shoots his cousin, he must have brought this revolver from the other room and drawn it after learning of the disclosure his cousin had made to Chin, but Chin does not say he saw Sam draw the revolver. If Chin came after the books, it would have been the natural thing for him to have demanded them of Sam, in whose possession he supposed them to be. If the purpose of his visit was to carry back the books, he would not have left the taxi five hundred feet away, but had it driven to the laundry. If Chin had been the witness of a murder, it would have been most natural for him to have disclosed it to those upon the street, especially when the murderer was one who refused to account for $600 which he had put into a business in which they were partners. Instead of uncovering the guilty, he flees to Meriden in the taxi in which he had come to Manchester, the place to which the jury might reasonably have found he hired the taxi in Hartford to take him. The change in Meriden from one taxi to another of a different color; the travel by taxi instead of by train, paying $23 instead of going by train when Chin had in his pocket

when he reached New Haven only $8 and Soo not half that amount, might reasonably have been regarded as an attempt to escape detection. Upon being apprehended, he told the officers he had not been in Manchester the morning of the homicide, but had left Hartford at eight o'clock looking for work. As a witness in his own behalf he says he was in Manchester, tells the purpose of his going, and that while at the laundry he witnessed the murder by Sam of his own cousin. Obviously his first statement, which he persistently adhered to, was incorrect. Flight and misstatement are not necessarily conclusive of guilt, but they are so often concomitants of guilt that the rules of law establish their admission in evidence as tending to prove guilt. As Chin was leaving the laundry, Sam says he cried out, "Ong Ging Hem was a member of the Hip Sing Tong," a Chinese society. If Sam's statement be true, as the jury might have found, they might have found in this accusation, as the State claimed, a motive for the homicide on the part of Chin.

The facts in evidence, which necessarily we must inadequately review in this opinion, abundantly establish that not only might the jury reasonably have reached the conclusion that the guilt of Chin Lung had been proved beyond a reasonable doubt and by testimony equivalent to that of two witnesses, but that any other conclusion would have been a highly unreasonable one to have reached. The charge against Soo is not that he shot Ong Ging Hem, but that he maliciously, deliberately, premeditatedly, and of his malice aforethought did aid, assist and abet Chin in this murder. Under our law such a charge, if proven, would make Soo equally guilty with Chin, who is charged as the principal offender. Counsel for Soo insist that the evidence against him is insufficient to convict him as an aider and abetter of Chin in the com-

mission of this crime beyond a reasonable doubt and by testimony the equivalent of that of two witnesses. The evidence is susceptible of no other reasonable conclusion than that Chin went to the laundry for the purpose of carrying out his premeditated purpose to kill Ong Ging Hem and that he shot him in execution of his purpose. Soo, under the arrangement of the preceding night, waked Chin on the next morning, and together they went to the Union station, where Soo helped Chin by arranging with the taxi driver for the fare to take them, as the jury might reasonably have found, first to Manchester and then to Meriden and not to Manchester only as Soo testified. Soo says the purpose of the trip was as Chin told him, to get the books; the jury might reasonably have found that the purpose was not to get the books, but to take the life of Ong Ging Hem. Soo gave the directions and arranged for the fare on the entire trip as far as New Haven. When Chin came to the taxi to go to Hartford, he told Soo Sam had killed Ong Ging Hem. Instead of seeking to have Sam apprehended, Soo merely said to the driver, "Home." His failure to notify the police was, he says, the result of his fear; all that he wanted to do was to get as far from the scene of the homicide as he could. Chin and he were together when they were arrested. He too told the officers he had not been in Manchester that morning, but had arisen and left Hartford about eight o'clock seeking work.

The jury might reasonably have reached the conclusion that his misstatements to the officers were made in an attempt to avoid detection for this homicide. The jury might also reasonably have found that as Chin was about to pass through the door he pushed the revolver in the box under the counter where it was found, that great care was taken of the revolver by the officers in order to keep intact any evidence of finger prints upon

it, and that the evidence of the two experts for the State as to the finger prints upon the revolver was both credible and trustworthy, and that the finger print which they testified they found on the left side of the barrel of the revolver was that of the middle finger of the left hand of the accused, Soo Hoo Wing. No evidence was offered by the accused to contradict or explain away the finger print testimony of these experts. If the jury credited it they might reasonably have reached the conclusion that Soo must have handed Chin the revolver, holding it by the barrel.

It was a reasonable inference for the jury to draw that Soo knew the purpose of the trip to Manchester and went with Chin to help him in making the arrangement for this trip. It was a reasonable inference also for them to draw that Soo testified falsely that he had not had the revolver in his possession that morning, and that if he did hand the revolver to Chin, whether it was his own revolver or that of Chin, he was aiding and abetting Chin in the use he made of it that morning. It was a reasonable inference for them to draw that the flight from Manchester without attempting to give notice of the crime was not the conduct of an innocent man in fear, but that arising from guilty knowledge and a desire to escape the consequences of participation in the homicide. The jury might also have drawn a like inference from the attempts by change of taxi to avoid detection. They could not have found otherwise than that his denial of being in Manchester that morning, and his assertion of his purpose in going to New Haven, were misstatements, and from them they might have drawn the inference that they were prompted by his guilt and made in the effort to escape its consequences. The jury might reasonably have found that from the time Soo waked Chin, at 5:45 on the morning of the homicide, he remained with him down

to the time of his arrest, helping him in getting to Manchester, going to the door of the laundry while Chin rapped for admission, and that at this very time Chin had upon his person the revolver which bore upon its left side the finger print of Soo, and that when Chin had killed Ong Ging Hem, Chin and Soo fled from the scene of the murder, Soo still helping Chin in the flight and concealing his knowledge of his trip to Manchester by misstatements persistently maintained.

The jury might, if they so found, reasonably reach the conclusion that Soo had been proven guilty beyond a reasonable doubt and by testimony equivalent to that of two witnesses, of aiding and abetting Chin in the commission of the murder charged.

The remaining reasons of appeal may be briefly disposed of. The plea to the jurisdiction, the motion to quash, and the challenge to the array, required a finding of facts by the trial court; instead, all that appears in the record is what purports to be a transcript from the evidence of what took place respecting each of these matters. A transcript of evidence is not a finding of facts by the trial court. The State does not question the facts alleged in the plea and the motion to quash; it does those alleged in the challenge to the array, and asserts counsel for the accused offered nothing in support of the motion. This, in part, is a mistaken view. Upon the court's inquiry, the clerk said the first panel, which was the regular panel, was drawn. While counsel inquired further of the clerk if it was true that the first panel was never summoned, the record does not disclose an answer to the question. Whether it was summoned or not, the jurors were not in attendance. In the condition of this record, we ought to assume that the first panel was not summoned. If they had been summoned, they would have been in attendance and called on to serve in this case in advance of the addi-

tional jurors drawn. General Statutes, § 5688, required the drawing of the first panel in advance of the term and the summoning of them for service. The drawing may be dispensed with if there be no business for the jury, and the summoning may be deferred until it is known that the jurors will be needed for the trial of cases. So the practical construction of this statute leads to the conclusion that the first panel in the instant case need not have been summoned until required for trial work. When the case before us was assigned for trial, the first panel should have been summoned, and the court, under § 5691, might then or thereafter have drawn and caused to be summoned additional jurors. Failure to have observed this course of procedure in this case does not necessarily result in prejudicial error. The additional jurors of the second panel only were drawn and summoned. The record does not show that counsel for the accused did not accept the jurors chosen, or that they exhausted their challenges, or any dissatisfaction on their part with the jury prior to the verdict. Everything in the record tends to the conclusion that the accused had a fair and impartial trial by a competent jury. The unusual fact that no exception to the charge, to the rulings on evidence, or to any interlocutory ruling, was taken during the trial, is conclusive that counsel for the accused were entirely satisfied that the trial judge had fully met the requirements of our law in his charge, his rulings on evidence, and his interlocutory rulings. The accused have been fairly defended by competent attorneys. The record does not suggest, and counsel for the accused do not point out, any indication of prejudice having resulted to the accused through the failure to have summoned the first panel for service in this case. Under these circumstances, we ought not to hold that this irregularity so prejudiced these accused as to entitle them to a new

trial. The failure to summon the first panel was an irregularity which fell within the fair intendment of General Statutes, § 5692, "No verdict shall be set aside on account of any irregularity in summoning the jury." No error was committed in overruling the challenge to the array.

The accused plead to the jurisdiction of the court for the reason that after they had, on March 24th, 1927, been bound over without bail to the Superior Court having criminal jurisdiction in Hartford County on the first Tuesday of June, 1927, and while they were confined in the jail in Hartford County by virtue of a mittimus issued by the Town Court of Manchester, the Superior Court, at its criminal term in March, 1927, had no jurisdiction over them. The State answered that the accused were indicted by a grand jury on March 29th, 1927, for the crime of murder in the first degree, and after the indictment and before the filing of the plea, a bench warrant was duly issued to the proper officer to arrest the accused and bring them before the Superior Court for Hartford County and the accused are in court by virtue of such bench warrant. The accused appeal from the judgment for the State on the plea to the jurisdiction. Since the accused were confined for the crime of murder punishable with death or life imprisonment, it was the duty of the attorney for the State to notify the court, whose duty it then was to order a grand jury. 2 Swift's Digest (1874 Ed.) pp. 393, 394.

The indictment was returned to a regular criminal term of the Superior Court in a county where the crime was committed, and it, by statute, had exclusive jurisdiction of the crime charged, and jurisdiction of all other criminal cases of which exclusive jurisdiction is not given to some other court; in all such cases the attorney for the State may file an original information.

*State* v. *Carroll*, 97 Conn. 598, 604, 117 Atl. 694; *State* v. *Keena*, 64 Conn. 212, 29 Atl. 470. The arrest of the accused under the bench warrant superseded the mittimus under which the accused were held. Upon the return to the Superior Court of the indictment against the accused, it obtained the sole and original jurisdiction of the charge therein made; the issuance of the bench warrant was the procedure by which the accused were brought before the court. The issuance of a bench warrant after an indictment had been found was the recognized practice under the common law. 4 Blackstone's Comm. 319; 2 Swift's Digest (1874 Ed.) p. 411. In this jurisdiction it has been the practice from an early time to cause an accused who has been bound over to the next or the next following criminal term of the Superior Court to be brought before a criminal term of that court preceding the term to which the accused has been bound over, to answer to a charge filed either by information or indictment. The binding over of the accused by the Town Court of Manchester was the process of the law by which the accused were held until such time as the Superior Court took cognizance of the charge against them. This it did when the indictment was returned to it. The prompt disposition of all criminal causes is the only way of safety for society and for the peace and order of the state. A speedy trial is the right of State and accused alike. Any practice which interferes with this undoubted right ought not to be countenanced by the court, and all interlocutory rulings should be made in the full recognition of the fact that the speedy disposition of criminal causes is essential to their fair disposition.

If the binding over of one accused of a serious crime to a term weeks and perhaps months distant has the effect of delaying the bringing of him to trial, the exercise by the Superior Court of its jurisdiction of the crime

The State *v.* Chin Lung.

would be put in abeyance by the inferior court and the protection of society suspended for that interval. Our administration of the criminal law has never been subjected to a practice which would, for the time, prevent it from attempting to protect society by vindicating the law. The first plea to the jurisdiction was properly overruled; the second likewise, for the reasons already presented.

The first ground of the motion to quash the indictment is not pursued. The second, the presence of an interpreter of the Chinese language in the grand jury room, is not well taken. The presence of interpreters, when deemed by the grand jury necessary in order to acquaint them with the testimony of witnesses unable to speak our language so as to be reasonably understood, is always permissible under our practice. *State* v. *Fasset,* 16 Conn. 457. Proceedings before the grand jury are conducted in secret, but we permit a magistrate to be present for the purpose of administering the oath to witnesses. *State* v. *Fasset, supra.* The presence of one authorized to administer oaths to witnesses, unless some member of the grand jury is so authorized, is indispensable. No one can testify who is not so sworn, otherwise his testimony would not be liable to the penalties of his perjury. We see no objection to the presence in a grand jury room of one who is essential in enabling them to have the witnesses properly sworn, or in assisting the grand jury in interpreting the testimony of a witness who cannot speak our language sufficiently to be understood, provided the grand jury shall request such assistance and select such person and he shall be first sworn to keep the secrets of the grand jury room and remain therein only during the performance of the function for which his presence is required.

The third ground has been disposed of in our consideration of the plea to the jurisdiction.

Error is predicated upon the denial of the motion for a mistrial and discharge of the jury (1) because of the mental and physical incapacity of juror Bidwell. The finding of the trial court that "at all times during the trial the juror . . . was in proper physical and mental condition to discharge his duties as a juror" disposes of this ground. And (2) because juror Hall while sitting as a juror for some days was ill and unable to intelligently and properly perform his dutie꜖ as juror, and once the case was continued for a period of ten days due to his illness. The trial court's finding expressly negatives this claim and there is nothing in the entire record to which our attention has been called, or which our examination has disclosed, which in the slightest degree impeaches the finding in this particular. The holding of the jury for ten days until the juror had sufficiently recovered to continue his jury duty was a matter well within the discretion of the trial court. The record reveals that the trial court exercised its discretion wisely and considerately.

Error is assigned in the failure of the court to exclude from the attention and consideration of the jury the evidence concerning the finger prints, the photographs of them, the opinion evidence of the experts, and all evidence in relation to the finger prints. Counsel for the accused made a motion to correct the finding by incorporating among their claims of law the claim which is presented in this assignment of error. The court denied this motion. Counsel have made no effort to have the appeal rectified. They now expressly abandon the assignment of error that the court erred "in denying the defendant's motion to correct and add to the finding." We must take the record as it stands and that discloses that counsel did not make such

The State *v.* Chin Lung.

claim during the trial. This assignment of error had no place in the appeal. The evidence made a part of the record, and which we have examined in passing upon the denial of the motion to set aside the verdict, does show that the testimony of the State's experts was received without objection or exception to it by the accused, that counsel for the accused cross-examined them at some length and as fully as they desired, and at no time made a motion to strike this evidence out.

No error in the court's charge in relation to this subject-matter is assigned.

The utility of finger-print evidence as a system of identification is universally admitted in this country, and its admission, when competent, relevant and material, has long been the accepted ruling of our courts. *People* v. *Roach,* 215 N. Y. 592, 109 N. E. 618; *State* v. *Connors,* 87 N. J. L. 419, 94 Atl. 812.

The trial court, upon seasonable objection, could not have properly excluded this evidence. Nor could it properly have removed it from the consideration of the jury. We do not attempt to follow the argument of counsel for the accused further. Nothing which they could have done could have excluded this evidence and nothing could have removed or lessened its significance except other evidence tending to disprove it, or destroy its reliability; counsel for the accused offered no evidence in contradiction or explanation of the finger-print evidence, or the photographs in connection with this evidence offered by the State.

If the evidence, if believed, tended strongly to point to the guilt of Soo it was a factual prejudice, just as the revolver and bullets were a factual prejudice.

There is no error.

In this opinion the other judges concurred.