STATE OF CONNECTICUT *v.* GEORGE M. DORTCH, JR.

GEORGE M. DORTCH, JR. *v.* STATE OF CONNECTICUT

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued November 5—decided December 9, 1952

*Francis F. McGuire,* with whom was *John F. Gallagher,* for the appellant (defendant in the first case and plaintiff in the second).

*Robert P. Anderson,* state's attorney, for the appellee (state).

JENNINGS, J.   These two appeals were argued together.  In the first Dortch appeals from his conviction of first degree murder.  He assigns error in the denial of his motion to set aside the verdict, in the charge and in rulings made upon the trial.  In the second he appeals from a judgment entered for the state on the sustaining of a demurrer to his petition for a new trial.  The denial of the motion to set aside the verdict will be considered first.

The statement of facts in the state's brief is a fair recital of the facts which the jury reasonably could have found.  It is, in substance, as follows:  Dortch had known the deceased, Dorothy Sebastian, casually for about ten years, but beginning in November, 1947, he began to see her more frequently.  She was married and lived with her husband and three minor children on the third floor of a tenement house on

the north side of the Stonington-Westerly Road in Stonington. Dortch himself was divorced. Commencing in February, 1948, he and Mrs. Sebastian adopted an adulterous relationship which resulted in her husband's leaving his home in April, 1948. Dortch then moved into the Sebastian apartment, where he lived until August 26, 1949. Mrs. Sebastian on that date compelled him to move because of his drinking habits and his quarrelsome and argumentative nature. He resented this very much particularly in view of the fact that Mrs. Sebastian continued to permit a sailor named Porter, who was going around with Mrs. Sebastian's daughter Laura, and another sailor, Jones, who was a friend of both Porter and Dortch, to visit her home.

Dortch lived at the New Park Hotel in Westerly, Rhode Island. At about 4:20 p.m. on September 3, 1949, after listening to the radio broadcast of a ball game, he went into a room across from his and there drank some whiskey and beer with a Mrs. Holmes and a Mrs. Taylor. Together they did not consume over one and one-eighth pints of whiskey from the time he went there until shortly after 7 p.m., when he returned to his own room. He claims that Mrs. Sebastian was to have met him there, and he was angry because she had not come. During the preceding two weeks, he had threatened to do harm to her and to kill her. About 7:10 p.m., September 3, he took his hunting knife and a sheath and placed it in his right-hand trouser-pocket. He went to Fiore's taxicab stand but found no taxi. He then went back to his room, fortified himself with a drink of whiskey, took the knife and sheath from his pocket and put them in his trousers in back of his belt, and went down to Pickering's taxicab stand, where he procured a taxi driven by the witness Shea.

Dortch, although he had shouted loudly for a taxi, was quiet and sober and acted normally during the one-and-one-tenth-mile drive to the Sebastian home. He turned on the radio and appeared to be listening to music from the local station until the taxi reached a point about 270 feet east of the Sebastian place, where he told the driver to turn out the headlights, drive past the Sebastian home and turn around about 1200 feet west of the house. As they drove past the house he looked up at it. After turning the taxi around as instructed by Dortch, the driver, on further instructions, let Dortch out about 100 feet west of the driveway into the house. Dortch gave the driver a dollar out of a handful of bills and took fifty cents in change.

Dortch crossed the street and went up to the Sebastian apartment, where he asked Jones and Porter, who were there, either sleeping or preparing to sleep, where Mrs. Sebastian was. Neither of them could tell him. He told Jones he was going to kill her, but Jones did not take it seriously. Dortch appeared normal and sober. He then ran down two flights of stairs and met Mrs. Sebastian in the back yard. He fell upon her with the hunting knife and stabbed her twenty-three times in the chest, abdomen and back. Jones heard her screams for help, saw Dortch stabbing her and ran to her rescue. In an attempt to pull Dortch away from her, Jones was badly cut in his left arm. Jones ran up the street and Dortch ran after him but discontinued the pursuit.

The stabbing of Mrs. Sebastian by Dortch gave her a large number of mortal wounds. Porter went to her and she said: "Help me, Porter! Junior [the defendant] has cut me." She died as a result of the wounds just after saying this, while Porter was still

with her. Dortch tried to commit suicide. He concealed himself behind a wall on the south side of the highway for a little over an hour and then went to the house of one Szymanski, where he gave himself up to the police.

When Dortch entered Szymanski's house he said: "I tried to kill someone and I want to give myself up." Szymanski further testified: "Well, he talked very clearly, and he seemed to know what he was talking about, I would say. He seemed sober to me." Two of the police officers who took him to the police station testified to the same effect. Shortly after his arrival at the station, he gave a circumstantial account of his movements during the day to these officers. In telling about taking his knife before going to the house of the victim, he said that he "had it on his mind to kill Dot."

An analysis of Dortch's brief narrows the issue. He not only admits, he insists that he is guilty of second degree murder. He claims, however, that he is not guilty of first degree murder. He bases this on the fact, claimed by him to have been proved, that there is no evidence from which the jury reasonably could have found deliberation, one of the essentials of first degree murder. The motive, the threats, the preparation in arming himself and the execution of his design all supply evidence of this element. In answer to the further claim of the defendant that the crime was committed in full sight of witnesses it might be pointed out that he thereafter attempted to commit suicide, a not unusual situation. Whether he was, as he claims, so intoxicated that he was incapable of deliberation or premeditation was a question of fact which the jury have decided against him. The appeal from the denial of the motion to set aside the verdict is without merit.

The statement of facts sufficiently describes the state's claims of proof. The claims of Dortch were essentially that he made no threats against the victim, that he suspected her of having an affair with a sailor who was present at the time of the killing, and that he suffered complete amnesia form the time he left the hotel until he started for Szymanski's house. He also claimed that he had consumed much more liquor than was testified to by the state's witnesses and was intoxicated both before and after the killing.

Three written requests to charge were duly filed and one oral exception was taken. The exception attacked the following charge: "That, I think, brings us to the vital question, the really controlling question that you will have to decide. It was not was he drunk. It was not was he intoxicated. It is not whether he was insane to a lesser degree than the standard which I read to you. It is on that day and at the time in question, did he have the legal degree of understanding? On all the evidence, on the whole case, if there is reasonable doubt of the sanity of the accused, he should be given the benefit of it by your verdict."

It is apparent on the whole record that the defense was making two overlapping claims, first, that Dortch had produced upon himself, over a period of time, an alcoholic psychosis resulting in a condition of pathological intoxication and amnesia; second, that he was intoxicated at the time to the extent that he was incapable of committing a "deliberate" murder. For the first he depended on the testimony of the medical experts, for the second on his own testimony, corroborated to some extent by his drinking companions on the afternoon in question. When the trial court delivered the charge quoted above, it was discussing primarily the claim

based on alcoholic psychosis. It was apt to that issue. The objection under discussion is just another case of taking a sentence out of context. Considering the charge as a whole, as we must (*Cackowski* v. *Jack A. Halprin, Inc.*, 132 Conn. 67, 71, 42 A.2d 838), Dortch was not harmed by the quoted passage.

The only written request to charge the claimed refusal of which is assigned as error was as follows: "One who commits murder when he is in such a condition of intoxication that his mind and will are incapable of forming a wilful, deliberate, premeditated purpose of taking life, is not guilty of murder in the first degree, and the same is true when a condition of incapacity to will, to deliberate and to premeditate arises from any other cause." The charge as delivered clearly stated that the elements of wilfulness, i.e., a specific intent to kill, deliberation and premeditation were all essential to the crime of murder in the first degree, that they all had to be proved beyond a reasonable doubt and that if any of the elements was lacking the killing at most would be murder in the second degree. It discussed at length the effect of intoxication as to these elements. In that connection the court said: "So, too, a killing by one who for any cause at the time the act was committed was incapable of conceiving and carrying into execution a deliberate plan to kill or was mentally incapable of intent or premeditation or who was beyond the power of self-control at the time, lacks the necessary elements of murder in the first degree."

This was followed very closely by these words: "To be of any significance in this connection, this drunkenness or intoxicated condition must have proceeded as far as to affect, and must have reached that state where it did so affect, the operation of the

mind as to make the man incapable for the time being of forming a rational intent or controlling his will, and where this drunken condition is present to that degree or extent, its presence negatives the essential characteristics of murder in the first degree. A man incapable of this reasoning and forming and carrying out an intent cannot be guilty of that degree of crime, but its presence to such a degree among the circumstances of a killing, disclosing beyond any reasonable doubt malice aforethought in other respects, would still leave the killing murder in the second degree. For, voluntary drunkenness, I caution you again is no excuse for crime, that is to say, this condition which arises from the use of intoxicating liquor, this immediate and temporary condition, is, as all men know, a condition that varies in degree according to the amount and character of the liquor taken and the temperament of the man who takes it. A man may show plainly by the manner of his speech, gait, the present [e]ffect of alcohol, and yet retain his faculties fully enough to reason, to know what he is about, and to form and carry out a rational, specific intent. He may, on the other hand, be so under the influence of liquor as to be for the time being unable to rationally consider any matter or to intelligently harbor a specific intent. It is clear, when intoxication is present to this latter degree, that it cannot fail to reduce the degree of the crime. If in any case where such a condition as I have last outlined is urged, the evidence raises a reasonable doubt of the existence of a specific intent to kill, the accused is entitled to the benefit of it."

Taken in its context and in connection with the charge as a whole, the quoted portion of the charge was sufficient to instruct the jury properly and to

comply with the request. The contention of the defendant, made in connection with another of his assignments of error, that the jury was not instructed that the crucial question was whether the defendant was incapable of deliberation at the very time of the killing is also completely answered by the above quotations.

None of the other assignments of error directed to the charge were called to the attention of the trial court either by written request to charge or by oral exception. Practice Book § 153. We are therefore not obliged to consider them. Since this is a capital case, however, we have studied them with care. The most important of them relate to the charge considered above or are elaborations of the written requests. None of them require a finding of error. A charge in a murder case is necessarily long, particularly when a defense of insanity is interposed. The charge in the case at bar was clear and fair, both to Dortch and to the state. It was "correct in law, adapted to the issues and sufficient for the guidance of the jury." *Bullard* v. *de Cordova*, 119 Conn. 262, 267, 175 A. 673.

The rulings on evidence do not require extensive comment. Two of them relate to the limitation placed by the court on cross-examination of state's witnesses. The court has a reasonable discretion to control the extent of such cross-examination when it is aimed at attacking credibility. *Robinson* v. *Atterbury*, 135 Conn. 517, 521, 66 A.2d 593; *Shailer* v. *Bullock*, 78 Conn. 65, 70, 61 A. 65. The record shows that had the questions been allowed they would have introduced issues foreign to the case at bar and of no substantial importance. Furthermore, the entire testimony of these witnesses shows that Dortch was deprived of nothing essential to his case.

One of Dortch's experts had testified that Dortch was suffering from pathological intoxication. He was then asked whether or not crimes of violence are frequently committed by a person in that condition. An objection to the question was sustained. An examination of this expert's further testimony shows that the information sought was testified to in substance. There is no error in the case of *State* v. *Dortch*.

The proposed evidence in connection with the petition for a new trial consisted of statements by two taxicab drivers, neither of whom was the one who drove Dortch on the night of the killing. If admitted, the evidence would have tended to establish that Dortch's approach to the Sebastian house was usually stealthy, as it was on the night in question, in that he ordered the taxi to stop some distance away. In the first place, this evidence was not newly discovered, because it related to actions of Dortch himself, of which he must have known. In the second place, in view of the practically undisputed facts surrounding the killing, it would probably not have changed the result. The petition also alleged that the testimony, if admitted, would strengthen the opinion of one of the experts that Dortch "did not have the mental capacity for perpetrating the killing deliberately, premeditatedly and wilfully." The opinion of the expert as already testified to by him could not have been more positive than it was. It needed no strengthening. As the trial court said in its memorandum, "It is obvious that the jury wholly rejected Dr. Cohen's opinion, since his testimony is utterly inconsistent with a verdict of first degree, if indeed it is consistent with any verdict other than one of acquittal. As previously pointed out, there is nothing in the new testimony which would be at

all likely to inspire in the jury any additional confidence in the accuracy of Dr. Cohen's opinion."

The legal principles underlying petitions for a new trial have been too recently examined to justify repetition here. *Krooner* v. *State,* 137 Conn. 58, 75 A.2d 51; *Smith* v. *State,* 139 Conn. 249, 88 A.2d 117. Suffice it to say that the trial court did not abuse its discretion in sustaining the demurrer to the petition.

There is no error on either appeal.

In this opinion the other judges concurred.