STATE OF CONNECTICUT *v.* ARCHIE CHESNEY

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued May 7—decision released July 23, 1974

*Edward F. Kunin,* special public defender, for the appellant (defendant).

*Donald A. Browne,* state's attorney, for the appellee (state).

LOISELLE, J. The defendant, Archie Chesney, was indicted by a grand jury for the crime of murder in the first degree in that he "wilfully, deliberately, with premeditation and malice aforethought did shoot and kill one Robert Lubas, in violation of Section 53-9 of the Connecticut General Statutes." A jury returned a verdict of guilty of murder in the second degree. The defendant has appealed,

assigning error in the court's rulings on evidence and in its refusal to direct a verdict for the defendant.

As there is no attack on the charge, the offers of proof included in the finding were unnecessary. The jury could have found the following facts from the evidence presented: On February 9, 1971, Robert Lubas, accompanied by his friend James Lindsey, entered apartment 703 of the Beardsley Terrace apartments in Bridgeport. Present in the apartment were the defendant, his brother Clarence Chesney, Richard Bush and Alfred Peterson. The defendant stated he wanted to speak with Lubas and the two men walked down an interior hall to the area of a bedroom where they had an argument. Shortly thereafter, the defendant, using a rifle he had been holding in a folded umbrella, shot Lubas. Seconds after being shot, Lubas staggered up the hall and on meeting Lindsey told him that "Archie" had shot him. Lindsey drove Lubas to a hospital where Lubas died.

At the time of the shooting, the defendant's brother and Bush were trying to break up the argument between Lubas and the defendant. Immediately after the shooting, Bush grabbed both the umbrella and the rifle inside the umbrella from the defendant. Bush subsequently handed the umbrella and rifle to a friend named Reno Franklin. The following day Bush retrieved the umbrella and rifle from Franklin and gave them to the Bridgeport police.

On the evening of the shooting, the defendant was apprehended in the Beardsley Terrace apartment. He gave a fictitious name to the investigating

police officers. He denied being involved in the shooting, denied being in the appartment at the time of the shooting, denied owning a gun, and claimed he was at other locations at the time Lubas was shot.

Paraffin wax to test for gunpowder residue was applied to the hands of Lindsey on February 9, 1971, and to the hands of the defendant on February 10, 1971. Subsequent analysis of the paraffin casts indicated the existence of nitrate particles in the area of the index finger and thumb of only the defendant's right hand and around certain holes in the surface of the umbrella. It was also determined that the bullet which caused the death of Lubas had been fired from the rifle taken from the defendant.

The defendant assigns as error the allowance in evidence of statements to Lindsey made by Lubas after he was shot. Lindsey testified that while he was in the kitchen he heard someone say, "What are you calling me? A liar?" He then heard "a popping noise." Seconds later Lubas was walking down the hallway, brushing along the wall and holding his chest. He appeared to be "a little woozy. He was staggering a little bit." Lindsey asked what happened and Lubas replied, "The bastard shot me." Lindsey asked "who?" and Lubas replied, "Archie." The defendant claims that there was insufficient foundation laid to admit this testimony as a spontaneous utterance in exception to the hearsay rule.

The factors to be considered in determining whether statements are spontaneous utterances falling within this exception to the hearsay rule are set forth in *Perry* v. *Haritos,* 100 Conn. 476, 484, 124 A.

44. In that case, the exposition of the subject by Wigmore was adopted. 6 Wigmore, Evidence (3d Ed.) §§ 1747–57. "The ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." *Cascella* v. *Jay James Camera Shop, Inc.,* 147 Conn. 337, 342, 160 A.2d 899. This preliminary question must be determined by the trial judge. His conclusion controls unless it is found to have been an unreasonable exercise of discretion. *Perry* v. *Haritos, supra,* 485. In the case before us the element of time between the shooting and the utterance was seconds. Lindsey testified that Lubas appeared "woozy" and "upset," that Lubas was holding his chest, brushing against the wall, and staggering. Under these circumstances, the court was not in error in allowing this testimony as within the spontaneous utterance exception to the hearsay rule under the authority of *Perry* v. *Haritos, supra.* See *Cummings* v. *General Motors Corporation,* 146 Conn. 443, 450, 151 A.2d 884; *Rockhill* v. *White Line Bus Co.,* 109 Conn. 706, 708–10, 145 A. 504.

The fact that the authorities cited from this state are all civil cases is of no moment. The same rule is applicable in the trial of criminal cases. 2 Wharton, Criminal Evidence (13th Ed.) § 298. In the great majority of the jurisdictions wherein the question has been considered, the courts have applied the rule that statements and utterances of a homicide victim, made after he is fatally wounded, are admissible where such utterances spontaneously and instinctively arise from the stress of pain or excitement caused by the act of homicide, and are

made so soon after the act as to preclude the idea of deliberation, fabrication and design. Annot., 4 A.L.R.3d 149.

On cross-examination, Lindsey was asked if he had testified before the grand jury. He responded affirmatively. When asked if he stated to the grand jury that Lubas had told him that Archie had shot him, the state objected on ground that an inconsistency cannot be shown by the fact that the present testimony had not previously been related. After the defendant's counsel claimed relevancy, the court stated, "Well, you see what you are doing here, Mr. Galluzzo, you are invading the secret proceedings of the Grand Jury. Now, what he did not say at a Grand Jury proceeding is not anything that can be used to impeach his credibility as I see it now. In the first place, as we know a Grand Jury proceeding, Mr. Galluzzo, it is very informally conducted. . . . So that what he didn't say to the Grand Jury I don't think can be used at this time to impeach the credibility of this witness." The question was then asked, "Did you tell the Grand Jury that Lubas said 'Archie shot me'?" The court stated, "Let's assume that he says, no. I don't believe that his testimony, number one, Mr. Galluzzo, impeaches the credibility of this witness, and number two, I don't think it's proper in this proceeding because again we are getting into the Grand Jury room." After permission to rephrase the question was granted, the witness was asked, "Did you tell the Grand Jury that your conversation with Lubas at the time in the apartment that Lubas said, 'Archie shot me'?" Upon objection the court stated, "I'll sustain the objection on the same grounds that unless you can show me some authority for invading

the proceedings within the Grand Jury room, I will not allow him to answer that question." An exception was taken.

The only ground of objection by the state and one of the grounds relied upon by the court in sustaining the objection was that the evidence sought was not contradictory. It is an elementary rule of evidence that prior statements may be used to impeach the credibility of a witness, but this can be done only if the court is satisfied that the prior statements are in fact inconsistent. *Grunewald* v. *United States,* 353 U.S. 391, 418, 77 S. Ct. 963, 1 L. Ed. 2d 931; 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 1040. In the case before us, the evidence to be elicited was not a statement inconsistent with testimony given on direct examination but rather an omission or failure to state certain facts in a prior hearing. If a former statement fails to mention a material fact presently testified to, which it should have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent. McCormick, Evidence (2d Ed.) § 34; 3A Wigmore, Evidence (Chadbourn Rev., 1970) § 1042. See *Schurgast* v. *Schumann,* 156 Conn. 471, 482, 242 A.2d 695. For example, if a witness had been under a duty to assert a fact upon a prior occasion but had remained silent, he may be impeached by showing that his present testimony included facts as to which he had been silent on the prior occasion. 2 Wharton, Criminal Evidence (13th Ed.) § 470; 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 1042; McCormick, Evidence (2d Ed.) § 34.

The proceedings of a grand jury are informal and untranscribed. Moreover, they are conducted in

secret. *State* v. *Menillo,* 159 Conn. 264, 274, 268 A.2d 667. Thus, the form and manner in which the inquest was conducted relative to this witness, whether the witness had been asked to relate all the relevant facts or whether he had been asked questions which would have elicited the omitted facts, are unknown. It cannot be stated with any degree of certainty that an omission in testimony before the grand jury constituted an inconsistency by which to impeach the witness' present testimony. See *State* v. *Mosca,* 90 Conn. 381, 391, 97 A. 340. Under these circumstances, the secrecy of the grand jury proceedings could not be invaded. See *State* v. *Coffee,* 56 Conn. 399, 410, 16 A. 151; *State* v. *Fasset,* 16 Conn. 457, 467. It was within the court's discretion to limit the scope of the cross-examination on the issue of credibility. *Vogel* v. *Sylvester,* 148 Conn. 666, 676, 174 A.2d 122; *State* v. *Dortch,* 139 Conn. 317, 325, 93 A.2d 490; *Shailer* v. *Bullock,* 78 Conn. 65, 70, 61 A. 65. The court did not abuse its discretion. *State* v. *Mosca,* supra; *Chany* v. *Hotchkiss,* 79 Conn. 104, 107, 63 A. 947.

During the course of the trial, the umbrella in which the rifle was concealed when the defendant shot Lubas was admitted as an exhibit. Bush testified that he grabbed the rifle and umbrella from the defendant and that he subsequently gave it to a friend named Reno Franklin to hold and told him to "put it away." The next day Bush retrieved the umbrella and rifle from Franklin and delivered them to the police. As Franklin was unavailable to testify, the defendant claims there was an insufficient foundation laid to show that the umbrella taken from the defendant by Bush was the one delivered to the police.

Each and every circumstance in the chain of custody need not be proved beyond a reasonable doubt. The reasonable doubt must be to the whole evidence and not to a particular fact in the case. *State* v. *Johnson,* 162 Conn. 215, 232, 292 A.2d 903. "There is no hard and fast rule that the prosecution must exclude or disprove all possibility that the article or substance has been tampered with; in each case the trial court must satisfy itself in reasonable probability that the substance had not been changed in important respects. . . . The trial court must also decide under the same test of reasonable probability whether the identification . . . is sufficient to warrant its reception in evidence. . . . The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it in making its determination; and there is no rule which requires the state to produce as witnesses all persons who were in a position to come into contact with the substance sought to be introduced in evidence. . . . The ruling of the trial judge may not be overturned except for a clear abuse of discretion." *State* v. *Johnson,* supra, 232–33. See *State* v. *Hall,* 165 Conn. 599, 605, 345 A.2d 17; *State* v. *Brown,* 163 Conn. 52, 56–57, 301 A.2d 547. There was no indication that the umbrella had been tampered with and there was sufficient proof as to its identification. The court did not abuse its discretion in admitting the umbrella into evidence.

The state put into evidence paraffin tests made on the hands of James Lindsey and the defendant. The defendant claims that the taking of the paraffin tests and their admission into evidence violated his constitutional rights. This claim was never made

at the time of trial and no objection was made to the offer of the exhibits. This being so, no review of this claim need be made unless the asserted right has newly arisen or unless the record adequately supports a claim that the defendant has clearly been deprived of a fundamental constitutional right and a fair trial. *State* v. *Evans,* 165 Conn. 61, 69, 327 A.2d 576.

Counsel for the defendant on appeal asserts in his brief that a defendant should not be bound by the doctrine of waiver, which is "especially inappropriate here where the defendant received assigned counsel." While such an argument may carry weight where a claim of incompetent counsel is made with serious intent and upon valid grounds, nowhere does appeal counsel directly assert the claim that this defendant received less than competent representation. Oblique references to the defendant's right to counsel as requiring "more than a body in a courtroom" are insufficient to bootstrap a belatedly-raised constitutional claim beyond the requirements stated in *Evans* and are discountenanced. Moreover, unless a claim of incompetency is made with serious intent and is based upon valid grounds, better judgment would dictate, and the honor of the profession would require, that the matter not be raised in the first instance. *State* v. *Clements,* 166 Conn. 96, 97, 347 A.2d 80.

Because the taking of paraffin casts raises issues involving fundamental rights under the fourth and fifth amendments, and because the record is sufficiently complete to consider the claim on its merits, the assignment of errors on this point will be reviewed. *State* v. *Evans,* supra. In *Schmerber* v. *California,* 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d

908, it was held that the withdrawal of a blood sample from the defendant's body without consent, but upon probable cause, did not violate his constitutional rights. In that case it was also stated that "compulsion which makes a suspect or accused the source of 'real or physical evidence'" does not violate a person's constitutional rights as it is not such as compels "communications" or "testimony." Id., p. 764. In the taking of paraffin tests there is no problem of application. There is no testimonial compulsion either directly, as in confession, or indirectly, as in polygraph tests. Consequently, applying paraffin casts to the accused's hands did not violate the fourth and fifth amendments any more than fingerprinting. *State* v. *Chin Lung,* 106 Conn. 701, 723, 139 A. 91; see *State* v. *Hassett,* 155 Conn. 225, 232, 230 A.2d 553 (seizing blood-stained shoes); *State* v. *Smith,* 156 Conn. 378, 383, 242 A.2d 763 (seizing mud-stained shoes to compare with plaster cast of footprint); *United States* v. *Wade,* 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (compelling a demonstration of the accused's voice); *Gilbert* v. *California,* 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (compelling an accused to give his handwriting); or *Cupp* v. *Murphy,* 412 U.S. 291, 93 S. Ct. 2000, 36 L. Ed. 2d 900 (taking scrapings from fingernails over protest). See also 3 Wharton, Criminal Evidence (13th Ed.) § 624.

The brief of the defendant asserts that paraffin tests are so unreliable that they should be inadmissible. This claim was never raised during the course of trial. No objection was made at the time the paraffin casts were offered as exhibits nor was it claimed by appeal counsel in any assignment of error. This claim first appears in the defendant's brief. We are constrained to determine the assign-

ment of errors relating to a claimed violation of constitutional rights even though not raised at the trial level under circumstances previously stated, but claims of error in evidentiary matters where no exceptional circumstances require a departure from our rule will not be considered.

The final assignment of errors briefed by the defendant is that there was insufficient evidence presented to prove malice aforethought. It is well settled that the law implies or infers malice from the circumstances of a killing when an unlawful homicide is shown to have been committed and where no circumstances of mitigation, extenuation or excuse appear. *State* v. *Vennard,* 159 Conn. 385, 400, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625; *State* v. *Miller,* 154 Conn. 622, 627, 228 A.2d 136; *State* v. *Jacowitz,* 128 Conn. 40, 44–45, 20 A.2d 470; *State* v. *DiBattista,* 110 Conn. 549, 559, 148 A. 664. The killing was done with a deadly weapon, and there were no extenuating or mitigating circumstances. *State* v. *Simborski,* 120 Conn. 624, 628–29, 182 A. 221. Applying this definition to the facts previously recited, it is clear that there was sufficient evidence to enable the jury to find malice aforethought.

There is no error.

In this opinion the other judges concurred.