STATE OF CONNECTICUT *v.* JOSEPH L. TABORSKY

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, JS.

Argued December 15, 1952—decided February 10, 1953

*Nathaniel Bergman,* special public defender, with whom was *John W. Joy,* special assistant public defender, for the appellant (defendant).

*Albert S. Bill,* state's attorney, with whom were *Douglass B. Wright* and, on the brief, *Joseph V. Fay, Jr.,* assistant state's attorneys, for the appellee (state).

INGLIS, J. The defendant was convicted of murder in the first degree in that, in the perpetration of a robbery, he killed Louis L. Wolfson. Upon this appeal, he claims error in the denial of his motion to set aside the verdict, in various rulings made upon the trial, and in the charge.

We consider first the refusal of the trial court to set aside the verdict. On March 23, 1950, Wolfson was employed in Cooper's Package Store, located at the northeast corner of New Park Avenue and Layton Street in West Hartford. New Park Avenue runs in a generally east and west direction and Layton Street runs northwesterly from it. Shortly

after 9 o'clock in the evening of that day, Wolfson was found lying in a pool of blood on the floor of the store. The police were called and he was taken to the Hartford Hospital. It was there discovered that he had been shot. A bullet had entered his face immediately to the left of the base of the nose and, following an upward course, had lodged in his brain. He died on March 26, 1950, as a result of the wound. The autopsy disclosed that the bullet was one fired from a .22 caliber revolver. The foregoing facts were not seriously disputed.

The principal witness for the state was Albert Taborsky, the younger brother of the defendant Joseph. Albert's testimony may be summarized as follows: He was the owner of a 1936 Ford coupe. Some weeks before March 23, 1950—he was indefinite as to the exact time—he bought a .22 caliber revolver at the request of Joseph and gave it to him. Not more than a week before March 23, he bought two boxes of cartridges for the revolver and handed them to Joseph. In the early evening of March 23, Joseph telephoned Albert at a store on Charter Oak Avenue where he was employed and slept and requested him to come to the home of Jennie Pedemonti on Belden Street. When Albert arrived there about 7 o'clock, he found his brother and saw a birthday cake on the table. Joseph said something about taking a piece of the cake to his mother.

At about a quarter after seven the two brothers left Belden Street in Albert's car. They drove around Hartford discussing what place they could rob. Finally, at about 9 o'clock, with Albert driving, they proceeded west on New Park Avenue and turned north into Layton Street. As they made the turn, Albert extinguished the lights and brought the

car to a stop about 100 feet from the corner in the light of a street lamp. Albert got out of the car, took off the black trench coat he was wearing and gave it to Joseph so that the latter could partially hide his face in the turned up collar. Joseph took from his belt the revolver which Albert had bought, put it in the pocket of the trench coat, told Albert not to get scared and "take off," and then went toward the package store. Albert then covered the rear license plate with his sheepskin vest. Getting back in the car he sat in the driver's seat and smoked a cigarette. While seated there he saw a boy whom he took to be a newsboy walking in a northerly direction on the other side of Layton Street. After a few moments Joseph returned and got into the car and they drove off at a rapid rate of speed. After going several blocks Albert turned on the car lights and they then proceeded to a parking lot near their sister's home on Charter Oak Terrace where Joseph lived. There Joseph told Albert that while in the package store the man had "jumped" him and the revolver had gone off accidentally. The car was left in the parking lot over night.

On the following afternoon, Joseph not having returned the car to Albert's place of business, as he had agreed, Albert located him at Mrs. Pedemonti's. Joseph said he had not read anything about the killing in the papers and told Albert that the car was still at their sister's. Albert procured the car and disposed of the black trench coat, which had been left in it, as old rags. About a week later Joseph told Albert that he had thrown the gun into the Connecticut River. Shortly thereafter Albert drove the car to Chicago and there sold it.

On January 17, 1951, while being questioned by the Hartford police concerning other matters, Albert

volunteered the information that he had been implicated in the killing of Wolfson. His statement concerning the incident was reduced to writing and later in the same day was read to Joseph in Albert's presence.

Albert was subjected to a lengthy and detailed cross-examination at the trial. So far as the record discloses he answered questions frankly, without any display of animosity and without any material self-contradiction. He admitted that he had been the cause of a good deal of trouble to other members of the family but stated that he held no grudge against Joseph. He denied that he had ever made threats against him. Nothing developed on the cross-examination which would necessarily cause a reasonable man to doubt Albert's credibility.

In addition to ample evidence proving the corpus delicti, there was corroboration of Albert's testimony by that of George Forler, a young man who at the time of the killing was eighteen years of age. He testified that shortly after 9 o'clock on the night of the killing, as he was walking easterly on the north side of New Park Avenue, he saw an automobile turn the corner from New Park Avenue into Layton Street. As the car made the turn its lights were extinguished. As he continued on his way, his view of the car was cut off for a time by a garage and gasoline station located on the northwest corner of the intersection, but after passing that building and turning into Layton Street he saw the car at a standstill on the opposite side of Layton Street. He proceeded northerly on the westerly side of Layton Street and when he arrived opposite the car he saw a man seated in the driver's seat whom he later identified as Albert Taborsky. He also saw the head of another man "pop up" on

the other side of the automobile. This man's head was uncovered and his hair was a light brown. Forler walked on. He later heard a noise, looked around and saw a person running from the direction of the package store to the car. This person got into the car and the automobile drove off at a rapid speed with its lights still extinguished.

When, on January 17, 1951, Joseph was faced with Albert's statement in the presence of several police officers, he at first said that he could not recall where he was on the night of the Wolfson shooting but later, after being reminded that the date was March 23, 1950, he said that that was his birthday and that he was at Mrs. Pedemonti's house until midnight. He further said that relations between him and Albert were good and that the latter must be crazy.

For the defense, the mother and two sisters of Albert and Joseph testified that Albert had struck his father on several occasions and his mother and his sister once each. They also said that at one time Joseph had ordered Albert out of the house and that then Albert had threatened to pay him back for that. The date of the making of this threat was fixed variously as being in 1946, when as a matter of fact Joseph was in state's prison, or in 1947. The defendant also introduced statements made by Wolfson on the night of March 23, 1950, and the morning of March 24, 1950, while he was in a critical condition and able to talk only with difficulty. These statements would not have been admissible as dying declarations but were put in evidence with the consent of the state's atorney. In the course of them, Wolfson described his assailant as a young man about five feet eight or ten inches tall, blond and with a baby face. The defendant is over six feet tall and has a dark complexion and a prominent chin. In this

connection, however, it is to be borne in mind that when Wolfson gave the description his condition was very poor, that he had seen the man who shot him in light coming from fluorescent lighting and from green neon signs and that possibly the man's coat collar had been turned up to cover his chin.

The defendant's own testimony consisted of a denial of all implication in the killing and the claim that on the evening of March 23, 1950, he had been at Mrs. Pedemonti's house from 7 until 10:30 o'clock and had then gone directly home to his sister's house. He stated that Mrs. Pedemonti had had a birthday cake in honor of his birthday and that when he left he took a piece to his sister. He further testified that Albert had come to Mrs. Pedemonti's house to talk with him on March 4, 1950, while a birthday party was in progress for one of Mrs. Pedemonti's children but that Albert had not been there at all on March 23, 1950. Mrs. Pedemonti supported this alibi. There were introduced in evidence, however, two written statements made by her to the police. In one of these she had said that Joseph had been at her house on March 23 for his birthday cake but had left early and that either that night or the next night Albert had come to get him. In the other she said that either on March 4 or March 23, she did not know which, Joseph had telephoned to Albert.

It was within the province of the jury to determine what credence they would give to Albert's testimony. It is true that he was an accomplice. Whether, because of that fact, corroboration of his testimony was essential was for the jury to determine. *State .v. Cots,* 126 Conn. 48, 56, 9 A.2d 138. In any event, his testimony was corroborated in many ways. In particular it was supported by

Forler in every essential detail save one. In the light of Forler's testimony, there can be no reasonable doubt that Albert himself was at the scene of the crime. The only essential fact as to which Forler's testimony does not corroborate Albert's is the identity of Albert's companion. The jury apparently believed that Albert was speaking the truth when he testified that it was Joseph. In support of that belief there was one very significant fact. It appeared that before either Joseph or Mrs. Pedemonti testified, Albert had known that Joseph was at Mrs. Pedemonti's on March 23 and had taken a piece of cake away from there. This he had testified to. It is hardly probable that he would have known either of these facts if he himself had not gone to Mrs. Pedemonti's house and had not heard Joseph say that he was taking the piece of cake. The fact that Albert knew those details is strong evidence that the two started out from Mrs. Pedemonti's together. And that they started out together is strong corroboration of Albert's claim that they were together at the scene of the crime. Furthermore, the jury might reasonably have believed that there was no motive for Albert falsely to implicate his brother in the crime. On the whole case we cannot say that the jury were not warranted in giving full credence to Albert's testimony.

The statute provides: "No person shall be convicted of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto." General Statutes § 8799. The defendant contends that this requirement was not satisfied by the evidence. The meaning and effect of this statute has been passed upon in many cases. *State* v. *Cots,* 126 Conn. 48, 56, 9 A.2d 138; *State* v. *Chin Lung,* 106 Conn. 701, 705, 139 A. 91; *State* v.

*Chapman,* 103 Conn. 453, 467, 130 A. 899; *State* v.
*Schutte,* 97 Conn. 462, 465, 117 A. 508; *State* v.
*Marx,* 78 Conn. 18, 21, 60 A. 690.

In *State* v. *Schutte,* supra, there was only one
witness whose testimony tended to prove that the
defendant was the one who did the killing. There
were other witnesses whose testimony tended to
prove that murder had been committed. We said
(p. 468) : "We are satisfied that the construction of
this statute, as . . . stated by Swift, is correct. Swift
[Swift's Evidence, p. 142] states that 'if there be two
or more witnesses, each testifying to different parts
of the same transaction, or to different circum-
stances attending it, and all concurring to prove the
crime alleged, this will be sufficient to warrant a con-
viction, though there should not be two witnesses to
any one fact.' By 'different parts of the same trans-
action, or different circumstances attending it,' the
author refers to relevant facts tending to prove an
essential element of the capital crime charged. All
that the statute requires, therefore, is that the proof
of all the essential elements of the capital crime
charged (each of which must be proved beyond a
reasonable doubt) shall not depend upon the testi-
mony of one witness. If one or more witnesses
testify to facts relevant and sufficient to prove some
of the essential facts of the capital crime charged,
and another witness or witnesses testify to facts
relevant and sufficient to prove the remaining essen-
tial facts, the jury may find that the statute has been
satisfied." The opinion goes on to say (p. 470) : "If
the defendant's contention is correct, the court
should charge the jury that in passing upon the re-
quirements of the two-witness statute they can only
consider testimony introduced which, although rele-
vant to prove one or more of the essential elements

of the crime charged, also tends directly to show the guilt of the accused, that is, directly indicates that the accused committed the crime. We are satisfied that the history of the statute, its proper construction and the practice under it, does not justify such a refinement." In short, we are committed to the position that, if the testimony of one or more witnesses tends to prove that a murder has been committed and if that of only one other witness implicates the defendant, that is sufficient to satisfy the statute. In the present case the state's proof fulfilled that requirement.

To summarize briefly, therefore, in the case at bar the jury were entitled to give full credence to Albert's testimony, corroborated as it was in many particulars by the direct testimony of Forler and by circumstantial evidence. The requirement of the two-witness statute was satisfied. Accordingly, the jury were reasonably warranted in finding beyond a reasonable doubt that the defendant had committed the murder in the perpetration of an attempted robbery. It follows that the denial of the motion to set aside the verdict was proper.

The remaining assignments of error are based upon matters contained in the finding. Since the evidence has already been detailed, it is not necessary to set forth the respective claims of proof. Such additional findings as are pertinent will be referred to in connection with the various points discussed.

Before the taking of evidence began and long before Albert Taborsky was called to the stand, the defendant moved that the court order that Albert be subjected to a mental and neurological examination. No evidence was offered to cast any doubt on the proposed witness' sanity and, in fact, both counsel stated that, because Albert also was indicted, he had

already been examined by two psychiatrists. The court denied the motion both on the ground that there was then no indication before it that Albert was insane and also on the ground that, at least until he was actually offered as a witness, the court had no power to compel him to submit to such an examination. The matter was not pursued further by the defendant. This ruling was correct. It is true that when a witness is called to the stand the state of his mind may be inquired into and, if the court is satisfied that he is mentally incompetent to testify, it is the court's duty to exclude him as a witness. *Holcomb* v. *Holcomb,* 28 Conn. 177, 179. If the defendant claimed that Albert was not a competent witness, the time to have presented that claim was when Albert was called to the stand. The purpose of the motion now under discussion was obviously nothing more than to get the court's assistance in obtaining possible evidence for future use. If Albert had been willing to undergo a mental examination, the defense could have had it without an order of court. If he was not willing, the court had no power to compel him to do so until he was offered as a witness.

On April 24, 1951, Attorney Bergman, at his own request, was appointed by the court to represent the defendant. On May 17, after nine jurors had been selected, he moved for the appointment of additional counsel to assist him. The court denied the motion. While it is true that frequently the appointment of an assistant public defender is justified in a capital case, we cannot say that the court's refusal to grant the motion under the circumstances in the case at bar constituted an abuse of discretion.

At the close of the evidence, the defendant moved to strike out "the confession or statement made by Albert Taborsky" on the ground that the police had

used improper methods to elicit it. No confession or statement of Albert had been introduced in evidence. Apparently, therefore, in making the motion, counsel was confused and really meant Albert's testimony. Testimony given in court under oath is not in the same category as statements made to police officers outside of court. The rule calling for the exclusion of the latter if obtained under circumstances which render the truth of them improbable is not applicable to the former. If it appears that the testimony of a witness may have been affected by undue pressure exercised outside of court, that is a consideration bearing upon the weight of the testimony. It does not render the testimony inadmissible. The motion was properly denied.

Upon cross-examination, Albert was asked by the defendant if he did not intend to leave the state after the case was over, and he replied in substance that he would like to. Upon redirect, the state's attorney, after directing the witness' attention to that answer, asked, "Don't you know you are under indictment for murder in the first degree in this same case?" Thereupon the defendant moved for a mistrial. The motion was denied and later the defendant's objection to the question was overruled. It is obvious that the defendant's purpose in bringing out the fact that Albert hoped to leave the state after the trial was to create the impression in the minds of the jury that he had been granted immunity from prosecution for his part in the murder. By bringing out the answer referred to, the defendant opened the way for the state to rebut that impression. The objection to the state's attorney's question was properly overruled and the motion for a mistrial was properly denied.

Another objection made by the defendant and overruled by the court was based on something said

in argument by the state's attorney. So far as the record discloses, the argument of the state's attorney was based solely upon the evidence and was proper. The court's ruling was correct.

The remaining assignments of error are directed at the charge. The defendant's requests to charge were not filed until after the state had concluded its opening argument. They were late. Practice Book § 153. Nevertheless, the court considered them, and its statement that all of them to which the defendant was entitled were included in the charge was correct. Only one of them requires notice. This was a request that the court rehearse to the jury in detail the testimony of Forler and the statements of Wolfson describing the physical appearance of Wolfson's assailant, as tending to cast doubt on his identity with the defendant. The discussion of the evidence in the charge was a terse summary of the conflicting claims of the parties. It called the jury's attention to the claim of the defendant that he had nothing to do with the crime and in that connection reminded them that the defendant "points to the evidence concerning the deceased's identification of his assailant." In view of the fact that the court had already instructed the jury that its failure to refer to any of the facts was not to be considered as an indication that those facts were unimportant and that it was the jury's recollection of all of the evidence which should control, it was not error for the court to refrain from a more detailed recital of the evidence bearing upon identity. *State* v. *Journey,* 115 Conn. 344, 350, 161 A. 515.

One exception taken was to that part of the charge in which the court discussed the possible effect of a finding that the revolver had been discharged accidentally. The claim of the defendant is that if the

revolver had gone off accidentally the crime would be nothing more than manslaughter. After making it plain that an unlawful killing without malice would be manslaughter, and after correctly defining malice, the court said: "[A] man may go out with the intent to commit robbery but without the intent of injuring anybody. In this frame of mind, he enters a place, and in committing or attempting to commit the robbery, he kills a person. That killing would be murder, even though there was no ill-will, hatred or malevolence toward the person killed, because the evil intent to commit the robbery carries over to make the crime murder in the first degree." This was a correct statement of the law. If a killing occurs in the perpetration of an attempted robbery it is not only murder but, by virtue of the statute, murder in the first degree. General Statutes § 8350. That is true even though the killing itself is accidental.

There is no basis for the defendant's criticism that the charge did not define attempted robbery. Both robbery and attempted robbery were fully and accurately defined. Claims that the charge failed to instruct the jury properly on the matter of corroboration of an accomplice and on the effect of former convictions of crime on the credibility of a witness and that it disparaged the testimony claimed to show animosity of Albert toward Joseph are all without merit. The charge as delivered was complete, correct in law and eminently fair.

There is no error.

In this opinion BROWN, C. J., and JENNINGS, J., concurred.

O'SULLIVAN, J. (dissenting). My disagreement with the majority arises out of a difference of

opinion as to the merit of certain assignments of error addressed to the charge.

This was a most unusual case. It was one where the only evidence linking the defendant to the murder came from his brother Albert. For the jury to return a verdict of guilty without that evidence was a legal impossibility. Some of the defendant's requests to charge were directed to the obvious irreconciliability of Albert's testimony with the description of the killer frequently given by Wolfson during the several days through which he lingered before dying. Wolfson, who had had a splendid opportunity to observe his assailant in the light of his well-illuminated store, described him as blond, short and baby- faced. The defendant is dark, tall and lantern-jawed.

Since the defendant could not have been the murderer if Wolfson's description was accurate, and because the defendant, both before and during the trial, had challenged his brother's sanity, at least three of the defendant's requests to charge were not only pertinent to the issues but, far more important, were actually vital to the defense. See A-303 Rec. & Briefs, back of p. 887 et seq., par. 145, 146, 147. The failure of the court to comply with these requests, I am convinced, was harmful error, requiring a new trial.

In this opinion BALDWIN, J., concurred.