JOSEPH L. TABORSKY *v.* STATE OF CONNECTICUT

SUPERIOR COURT          HARTFORD COUNTY          FILE No. 92217

Memorandum filed March 26, 1954.

*Nathaniel Bergman* and *John W. Joy,* both of Hartford, for the Plaintiff.

*Albert S. Bill,* State's Attorney, of Hartford, for the State.

HOUSE, J. The plaintiff, Joseph L. Taborsky, on June 7, 1951, after a trial by jury was found guilty of murder in the first degree, based on the indict-

ment that on March 23, 1950, he killed one Louis L. Wolfson while engaged in the perpetration of a robbery. An appeal was taken to the Supreme Court of Errors which affirmed the judgment. *State v. Taborsky,* 139 Conn. 475.

At the trial the principal witness for the state was Albert Taborsky, the younger brother of the accused. The importance of the testimony of Albert in the murder trial of Joseph is well indicated by the words of Justice O'Sullivan in his dissenting opinion: "This was a most unusual case. It was one where the only evidence linking the defendant to the murder came from his brother Albert. For the jury to return a verdict of guilty without that evidence was a legal impossibility."

In the present proceedings Joseph moves that the judgment against him be set aside and that he be allowed a new trial of the charge against him. After setting forth the conviction of Joseph and the substance of Albert's testimony against him, it is alleged in the petition for a new trial that Albert pleaded guilty to second degree murder in connection with the same homicide and was sentenced to state's prison for life. Shortly after Albert was incarcerated in the state prison he was found to be mentally ill and upon due application by the warden of the prison and a mental examination, he was removed to the Norwich state hospital, where he is presently confined. The petition for a new trial "alleges and vehemently contends" that Albert "was insane during the trial, and for a long time prior thereto; and that he was an incompetent witness and Non Compos Mentis at the time" he testified. As the basis for the claim for a new trial it is alleged that the petitioner has discovered material evidence in his favor concerning the insanity of Albert during Joseph's trial "which evidence he failed to discover and was unable to dis-

cover before or during the trial, although he used all reasonable diligence in endeavoring to find testimony of this nature in his favor."

A long line of cases has established the prerequisites for the granting of a new trial. The evidence must not have been available at the time of the first trial. *Corey* v. *State,* 126 Conn. 41, 43. The petitioner must establish that due diligence was used to discover competent evidence at the time of the first trial. *Lester* v. *State,* 11 Conn. 415; *Waller* v. *Graves,* 20 Conn. 305; *White* v. *Avery,* 81 Conn. 325; *Hall* v. *Tice,* 86 Conn. 684; *Kliarsky* v. *Eastern Greyhound Lines, Inc.,* 116 Conn. 649; *Crook* v. *Clarke,* 124 Conn. 317. The new evidence must not be cumulative and must be of such a nature that in all probability it would bring about a different result. *Krooner* v. *State,* 137 Conn. 58. The burden of proving that the newly discovered evidence, if offered, would probably bring about a different result and that the requisite due diligence has been employed is upon the plaintiff in seeking a new trial. *Link* v. *State,* 114 Conn. 102, 107.

Over seventy years ago Chief Justice Park of the Supreme Court of Errors in an opinion on a petition for a new trial upon an indictment for murder enunciated the already well-established principles which have been since followed: "The law on the subject of new trials for newly-discovered evidence, is well settled in this state by a long and uniform course of judicial decisions from our earliest reports down to the present time. The following are some of the leading cases on the subject. *Noyes* v. *Huntington,* Kirby, 282; *Lester* v. *State,* 11 Conn. 418; *Norwich & Worcester R.R. Co.* v. *Cahill,* 18 Conn. 493; *Waller* v. *Graves,* 20 Conn. 210; *Parsons* v. *Platt,* 37 Conn. 563. These cases hold that to entitle a party to another trial on the ground of newly-discovered evidence, it must be made to appear that the evidence

relied upon for such purpose was in fact newly-discovered; that it would be material to the issue on another trial; that it could not have been discovered and produced on the former trial by the exercise of due diligence; that it must not be cumulative; and that it must be sufficient to produce a different result on another trial, should the cause be determined solely upon the law and the evidence." *Hamlin* v. *State,* 48 Conn. 92, 93.

In support of his petition the plaintiff produced twelve witnesses. Of these, six testified to observations of and contacts with Albert prior to and during the trial. The others testified to their observations subsequent to the trial and the psychiatrists, in addition, gave expert opinions based upon hypothetical questions.

It would serve no useful purpose in this memorandum of decision to attempt to recount and analyze the substance of the testimony of the individual lay witnesses, or to discuss as to each one whether due diligence had been exercised to discover the substance of his testimony at the time of the first trial. It appears from the evidence that, with the exception of Mrs. Phelps, all of the witnesses were available within the vicinity at the time of trial and I am not satisfied that the plaintiff has sustained the burden of demonstrating that due diligence would not have made their testimony then available. Even with respect to Mrs. Phelps, who was out of the state at the time of the trial, it appears that she had previously employed Albert and when he was in police court in 1949 discussed with Albert's mother her observations of Albert. Mrs. Taborsky, who assisted in Joseph's defense and testified for him, certainly knew of this evidence, yet there was no indication whatsoever of any attempt to ascertain Mrs. Phelps's whereabouts or obtain her testimony at the first trial.

The attempt of the plaintiff to question the mental capacity of Albert did not arise subsequent to the trial. It is obvious from the record that the plaintiff and his counsel had a considerable amount of information available prior to the trial and that they were put on notice that there were irregularities in Albert's behavior pattern. Joseph's attorney served as counsel for Albert prior to the trial. At the opening of the trial and before Albert was produced as a witness, defense counsel moved the court that an order be entered requiring Albert to submit to a mental examination because "he is going to be the principal witness." In the course of the motion defense counsel stated to the court "we have cause to believe and feel that it is urgent that we determine his mental and neurological status at this particular time" and "there is reason to believe that there is instability mentally and neurologically, because of his conditions and behavior" and "in view of the knowledge and the background that I have been given by the family concerning this brother, the proposed witness, and his conduct and his actions, and the reports thereon at the jail, would indicate to my mind that we ought to have a more thorough going over of his mental condition." Such a motion before the individual was actually presented as a witness was unusual if not unprecedented. Despite the trial court's request for any citation of authority to support the granting of such a motion when made at that time in the proceedings and before the person in question was presented as a witness, there is no indication that any authority was presented, despite the assurance of counsel that "I'll see if I can dig up any authority for you." The propriety of the ruling of the trial court was sustained by the Supreme Court of Errors (*State* v. *Taborsky,* 139 Conn. 475, 486), which reaffirmed the well-established rule that "until he was actually offered as a witness, the court had no power to compel him to submit to such an

examination." It is true that when a witness is called to the stand the state of his mind may be inquired into and, if the court is satisfied that he is mentally incompetent to testify, it is the court's duty to exclude him as a witness. *Holcomb* v. *Holcomb,* 28 Conn. 177, 179. If the defendant claimed that Albert was not a competent witness, the time to have presented that claim was when Albert was called to the stand. Despite this well-established rule and the indication by the trial court that the motion for a mental and neurological examination was denied at that time because it was premature, Albert not yet having been called to the witness stand, the motion was at no time thereafter renewed nor was any other motion of similar import thereafter made at any time during the course of the trial. When Albert was called to the witness stand and testified during two days of trial, no objection whatsoever was raised on the claim of mental incapacity or incompetency as a witness.

While it is unthinkable that one on trial for his life should be prejudiced by a failure to comply with established procedures or to make a motion at the proper time, the statements of counsel made in connection with this preliminary motion and the failure to renew the motion when Albert was presented as a witness are of significance now in the light of the claim that the due diligence requirement necessary for the granting of a new trial has been fulfilled.

The plaintiff has not established that the claimed new evidence could not have been obtained and presented at the original trial if due diligence had been exercised.

Although the question as to Albert's competency to qualify as a witness was not subsequently directly raised for a determination by the court, the record discloses repeated and continued references to his

prior course of conduct with the obvious purpose of attacking his credibility as well as competence and sanity. The dissenting opinion in *State* v. *Taborsky,* supra, 490, noted that "the defendant, both before and during the trial, had challenged his brother's sanity." There were, among others, questions as to whether Albert had weak moments mentally, his fears for harm from his cell mates, his fears, worries and inability to sleep while at the jail, his troubles with cell mates, his unusual behavior at the jail, his earlier consideration of suicide while at Cheshire, his family troubles and disagreements, his feeling of insecurity, his mental aberrations, his sexual behavior, that he was always nervous, quick tempered, neurotic and very demanding, his actions and conduct at home "to show the credibility and the mental condition," that he hit his head against a wall when he was nine, that he refused to eat, that he "had an awfully funny look, a wandering look on his face" at the jail.

Without at this time going into all the details of the proffered new testimony, it is sufficient to state the conclusion that the evidence offered by the witnesses Mrs. Phelps, Dr. Kardys, Meikle, Conger, Narducci and Rev. Hirshon was an enlargement in detail of the evidence offered at the original trial as to the conduct, appearance and activities of Albert and was, therefore, cumulative. "Evidence is cumulative which merely multiplies witnesses to any one or more of these facts before investigated, or only adds other circumstances of the same general character." *Waller* v. *Graves,* 20 Conn. 305, 311; *Gonirenki* v. *American Steel & Wire Co.,* 106 Conn. 1, 11.

The proffered testimony of Dr. Priddy, LaFlamme, the prison guard, and the four psychiatrists, Dr. Carbone, Dr. Carey, Dr. Cohen and Dr. Vernlund, was of necessity restricted to Albert's activities and mental condition subsequent to the trial.

It is new evidence in the sense that the witnesses obviously did not know the facts nor have the opinions to which they testified at any time prior to Albert's appearance as a witness. Their factual testimony was necessarily limited to occurrences subsequent to the trial and since the matter in issue was Albert's mental competence as of the time of trial, their opinions were unavoidably based to a considerable degree upon the details and subject matter of the evidence introduced at the first trial plus the cumulative evidence offered by the new witnesses who testified in support of the action for a new trial.

If the decision in this matter were to be based solely upon the requirement that the plaintiff's newly discovered evidence had been unavailable despite due diligence and be non-cumulative, plaintiff's application should be denied at this point.

However, "in a case where human life is at stake, justice, as well as humanity, requires us to pause and consider before we apply those rules in all their rigor." *Andersen* v. *State,* 43 Conn. 514, 517. A new trial will be granted "when it appears reasonably certain that an injustice has been done, and that the result of the new trial will probably be different although the evidence supporting the new trial be cumulative." *Krooner* v. *State,* 137 Conn. 58, 67; *Gonirenki* v. *American Steel & Wire Co.,* 106 Conn. 1, 12.

After a careful examination of the lengthy transcript of the original trial and a review of the evidence offered in these proceedings, together with the exhibits in the two cases, I cannot conclude that any injustice has been done or that the result of a new trial would probably be different.

It would serve no useful purpose in this memorandum to review and discuss all of the testimony. Certain matters, however, appear to be of particular significance. The witness whose mental capacity is

now questioned was on the witness stand for the better part of two days. He was subjected to a lengthy direct examination and to a gruelling cross-examination. There is nothing in a reading of the 180 pages of his testimony which would indicate that he suffered at that time from any mental derangement or disease or confusion. Indeed, it is hardly to be doubted that had he given any such indication on the witness stand or so conducted himself as to indicate any question as to his mental competence, the trial court would on its own motion, even if defense counsel failed to raise the point, have expressly and directly examined into his mental condition.

The Supreme Court of Errors, after reviewing the record on appeal, noted, "Albert was subjected to a lengthy and detailed cross-examination at the trial. So far as the record discloses he answered questions frankly, without any display of animosity and without any material self-contradiction. . . . Nothing developed on the cross-examination which would necessarily cause a reasonable man to doubt Albert's credibility. . . . On the whole case we cannot say that the jury were not warranted in giving full credence to Albert's testimony. . . . To summarize briefly, therefore, in the case at bar the jury were entitled to give full credence to Albert's testimony, corroborated as it was in many particulars by the direct testimony of Forler and by circumstantial evidence." *State* v. *Taborsky,* 139 Conn. 475, 480, 483, 485. There is certainly nothing in the record to justify the claim of the defendant that this testimony came from "a crazed, depraved, errant and irrational mind."

It casts no reflection upon the professional competency or opinion of the psychiatrists who testified for the petitioner in these proceedings that greater weight must be given to the opinion of those psychiatrists whose opinion is based upon actual examination of Albert over a period of time before he testi-

fied as well as subsequent thereto, while theirs was of necessity based upon examination made after the trial and after his own conviction and sentence to state's prison, where it appears he was ostracized and treated as a "rat" and "squealer" by the inmates. Dr. Bancroft had made a psychiatric examination of Albert Taborsky as early as December 15, 1949, in connection with a police court matter, he examined him several times while he was in jail awaiting trial, by coincidence he was in the courthouse on the day Albert testified and observed him on the witness stand, and after he was sent from state's prison to the Norwich state hospital he examined him again.

In response to the question, "In your opinion, from the first time you examined him, right through until the time of the trial, what is your opinion as to his mental capacity to understand the nature of an oath and his mental capacity to receive facts and incidents that he has seen and heard, and narrate them at a later date?" Dr. Bancroft testified, "I believe he had that capacity." That is the capacity required of a witness. 2 Wigmore, Evidence (3d Ed.) § 492.

After examining Albert subsequent to his confinement in state's prison and later commitment to the Norwich state hospital, Dr. Bancroft concluded: "Based on the available facts, it was reasonable to assume that Albert Taborsky developed an acute, psychotic reaction at some time after beginning his sentence at the Connecticut State Prison, and that although greatly improved, he has not yet completely recovered from his psychotic reaction."

It is also significant that Dr. Bancroft's opinion as to the time when Albert developed a psychotic reaction is confirmed by the only doctor who observed him during that time. Dr. Priddy, senior physician at the state prison, with twenty-three years of experience in the observation of the mental condition of the

prison inmates, first examined Albert on June 21, 1951, two days after his admittance to the prison. In the opinion of Dr. Priddy, Albert was not psychotic when he entered the prison. On the contrary he was "rational," "responsive," and "oriented." It was not until August and after he had been subjected to the hostile treatment and ostracism of the other inmates that Dr. Priddy concluded that Albert had become psychotic and thereafter called in Dr. Carey for psychiatric consultation.

In the light of this testimony I cannot conclude, as the petitioner claims, that Albert was an incompetent witness and that any injustice has been done. Nor has the petitioner established, as he must, that his claimed new evidence would probably bring about a different result on a new trial. *Link* v. *State,* 114 Conn. 102, 107.

There was much evidence to corroborate the testimony of Albert in its essential details. His description of the car in which he drove his brother to the scene of the murder was corroborated by the witness Forler. The victim was shot with a .22 caliber bullet. Mrs. Tuite confirmed Albert's story that he purchased a .22 caliber gun from her. The witness Forler identified Albert as the driver of the car used in the holdup and corroborated many of the details testified to by Albert. Albert's description of the clothing worn by the victim fitted what he was wearing when found fatally shot. There was corroboration of Albert's details about the birthday cake at Mrs. Pedemonti's before he started for the scene of the murder with Joseph.

Upon all the evidence, both that offered at the original trial and that presented in these proceedings, I must conclude that the material evidence offered as newly discovered is cumulative, that it has not been established that by due diligence it

could not have been presented at the trial, that the proffered newly discovered evidence would not, in all probability, bring about a different result upon a new trial and, most important of all, that no injustice has been done to the petitioner.

Judgment may enter dismissing the petition.