JOSEPH L. TABORSKY *v.* STATE OF CONNECTICUT

BALDWIN, O'SULLIVAN, WYNNE, PHILLIPS and DEVLIN, Js.

Argued June 14—decided July 29, 1955

*Nathaniel Bergman,* special public defender, with whom was *John W. Joy,* assistant special public defender, for the appellant (plaintiff).

*Albert S. Bill,* state's attorney, with whom, on the brief, was *Douglass B. Wright,* assistant state's attorney, for the appellee (state).

PHILLIPS, J.  On March 23, 1950, Louis L. Wolfson was employed at Cooper's Package Store in West Hartford.  About 9 p.m. on that day he was found lying in a pool of blood on the floor of the store.  He had been shot in the face.  He died March 26, 1950.  Many months later Joseph Taborsky was indicted for the crime.  On June 7, 1951, after a trial to the jury, he was found guilty of murder in the first degree.  On appeal this court upheld the judgment, two judges dissenting. *State* v. *Taborsky,* 139 Conn. 475, 95 A.2d 59.  Subsequently, Taborsky filed with the Superior Court a petition for a new trial on the ground of newly discovered evidence.  After a hearing on the merits, the court dismissed the petition.  The present appeal is taken by Taborsky from that judgment.

At the trial to the jury on the indictment, the principal witness for the state was Albert Taborsky,

a younger brother of the accused. The brothers will be referred to hereinafter as Albert and Joseph. Albert testified that at about 7:15 p.m. on March 23, 1950, he picked up Joseph in his automobile at the home of Jennie Pedemonti on Belden Street in Hartford; that they drove around Hartford discussing what place they could rob; that about 9 o'clock, with Albert driving, they stopped near Cooper's Package Store; that Joseph put on a black trench coat which Albert had been wearing, took a .22 caliber revolver which Albert had bought some time previously, went into the package store, and after a few minutes returned and got into the car; and that they then drove off rapidly to a parking lot on Charter Oak Terrace, where Joseph told Albert that while he was in the package store the man had "jumped" him and the revolver had gone off accidentally. Albert related many other circumstances about the evening in question which it is not necessary to detail. Albert's testimony was corroborated in some respects by another witness, George Forler, who was walking on the opposite side of the street from the parked car. He identified Albert as the man seated in the driver's seat. He also saw the head of another man, about six feet tall with light brown hair, "pop up" on the other side of the automobile. At no time did he identify Joseph as that other man. Joseph's defense was that he was at the home of Jennie Pedemonti from 7 p.m. to 10 p.m. on March 23, 1950, which was his birthday, and that Albert had not been there at all. This alibi was supported by Mrs. Pedemonti. On the night of the crime and the following morning, while Wolfson was in a critical condition, he described his assailant as a young fellow, a teen-ager, with blond or light hair, five feet eight or ten inches tall, and baby-faced.

Joseph is over six feet tall and has black hair, a long face and a long chin. He was then twenty-six years old.

The only evidence linking Joseph with the crime was the testimony of his brother Albert. Unless the jury believed that testimony, it would have been legally impossible for them to return a verdict of guilty. It is with this background in mind that we must approach this petition for a new trial, since the petition brings into question Albert's sanity at the time of the trial on the indictment.

In the determination whether a new trial will be granted on the ground of newly discovered evidence, the primary test is whether an injustice was done and whether it is probable that on a new trial a different result would be reached. *Smith* v. *State,* 141 Conn. 202, 208, 104 A.2d 761; *Dortch* v. *State,* 142 Conn. 18, 21, 110 A.2d 471. The burden of proving the probability of a different result is upon the plaintiff, and in determining that issue the trial court exercises a discretion which cannot be reviewed unless its discretionary power has been abused. *State* v. *Goldberger,* 118 Conn. 444, 457, 173 A. 216. It must also be made to appear that the new evidence could not have been discovered and produced on the former trial by the exercise of due diligence, and the new evidence must not be cumulative. *Hamlin* v. *State,* 48 Conn. 92, 93. All of the above rules are qualified in their application to a capital case in the light of the principle laid down in *Andersen* v. *State,* 43 Conn. 514, 517, that "in a case where human life is at stake, justice, as well as humanity, requires us to pause and consider before we apply those rules in all their rigor."

When we speak of a new trial we must keep in mind the unusual situation presented by this case.

From the evidence, it appears that Albert was insane at the time of the hearing on this petition and may never regain his sanity. In applying the test whether it is probable that on a new trial a different result would be reached, we must assume the possibility that Albert will be sufficiently recovered to qualify as a witness or, if not, we must assume, without deciding, that the transcript of his testimony at the previous trial would be admissible at the new trial. By so assuming, we can adequately apply this fundamental test.

The chronology of events relevant to this petition is as follows: The crime was committed March 23, 1950. Albert was incarcerated in the Hartford County jail on January 26, 1951. He testified as a state's witness at the trial on the indictment of Joseph on May 23 and 24, 1951. Albert pleaded guilty to second degree murder and was sentenced to state prison for life on June 19, 1951. He was admitted to the prison hospital August 7, 1951, and was transferred to Norwich State Hospital September 19, 1951, suffering from dementia praecox (schizophrenia), paranoid type.

The evidence offered on the trial of this petition may be briefly summarized as follows: Mrs. Effie Phelps, who was in contact with Albert from October, 1949, to February, 1950, and John F. Narducci, who employed him to do chores from April, 1950, to October, 1950, testified to actions which led them to believe that he was mentally subnormal. William T. Meikle, a guard at the jail, observed Albert from January 26 to June 19, 1951. Albert's eyes were glassy, he looked off into the distance, heard voices talking and bells ringing on several occasions, tried to go through a door that was not there, had crying spells, thought people were trying to kill him and

that his food was poisoned, and masturbated in the open. Meikle concluded that there was something radically wrong with Albert mentally. Howard H. Conger, night guard at the jail, testified along the same lines. Dr. John A. Kardys, attending doctor at the jail, observed and treated Albert from January 26 to June 19, 1951. He was of the opinion that Albert had a "schizophrenic personality" and recommended to the jailer that he be examined by a psychiatrist and be committed to an institution.

Dr. Foster E. Priddy, physician at the state prison, examined Albert on June 21, 1951, shortly after he arrived there. Albert did not appear to Dr. Priddy to be psychotic then, but about six weeks later the doctor reached a contrary conclusion and ordered Albert to the prison hospital. George La Flamme, guard and supervisor of mental patients at the prison, observed Albert from August 7 to September 19, 1951. Albert thought La Flamme was Wolfson and always called him by that name. Albert had crying spells, thought his food was poisoned and wanted to kill himself. La Flamme considered Albert a mental case. Dr. Thomas E. Carey, consulting psychiatrist at the prison, observed Albert from August 18 to September 4, 1951. Albert was having auditory, olfactory and gustatory hallucinations. It was Dr. Carey's opinion that Albert was experiencing an early schizophrenia, that from January to June, 1951, he was probably in a formative stage of psychosis (insanity), and that while what he said could have been true, he, Dr. Carey, would be reluctant to accept what anyone in that condition said as final, absolute proof.

Dr. Hubert A. Carbone, psychiatrist and clinical director at Norwich State Hospital, observed and treated Albert in October, 1951, and thereafter.

When Albert entered the hospital, he was suffering from schizophrenia, paranoid type. In answer to a hypothetical question, Dr. Carbone stated his opinion that Albert had schizophrenia from January, 1951, to June, 1951. He had hallucinations and delusions and bizarre ideas. He gave an accurate account of certain things, and there was no evidence that his memory was grossly impaired. Memory is not involved in the schizophrenic process, but the patient is prone to misinterpret situations, facts and ideas to suit his own needs.

We mention only the highlights in the lengthy testimony of the other four psychiatrists who were called. The first was Dr. Carl Vernlund. He examined Albert at Norwich State Hospital on January 6, 1952. His opinion, based on his examination and the history of the patient, was that Albert was mentally ill at the time of the crime, during his incarceration at jail, during the trial, and at the time he was sentenced to prison and that he will never recover. In answer to a hypothetical question, Dr. Vernlund gave the further opinion that at the time Albert testified in court he was suffering from delusions and hallucinations and was under great emotional stress and that it would not have been possible for him to comprehend the nature of an oath or the charges against him. He could have had a compulsive force that would tell him what to say and he would not know whether it was true or not. Albert's father had a psychosis of a type in which there is a hereditary tendency.

Dr. Louis H. Cohen examined Albert at Norwich State Hospital on January 6, 1952. His opinion, based largely on observation and Albert's account of his experiences in jail, in court and in prison, but in part on facts stated in a hypothetical question,

was that Albert was insane the latter part of 1949, during 1950, during 1951, and up to the date of the examination; that his mental condition was such that it would be very easy for him to misinterpret reality and that he would have had no moral responsibility or appreciation of an oath in May, 1951. Albert mentioned to Dr. Cohen that while he was on the witness stand he saw various "pictures"—a car under a street light at the Pedemonti house, "Joe" in full view, a camera or a strong projector. Dr. Cohen stated that it was not surprising that Albert could go through examination and cross-examination without showing signs of insanity.

Dr. Harold A. Bancroft examined Albert on December 15, 1949, for the Hartford Police Court in connection with another matter and reported that he showed no signs of mental illness. At the request of the state's attorney, Dr. Bancroft examined Albert at the jail on January 19 and 24 and February 3 and 5, 1951, and at Norwich State Hospital on November 19, 1951. He also saw Albert informally four or five other times at the jail between February 5, 1951, and the trial. He also observed Albert by chance for about an hour while Albert was testifying at the trial. Dr. Bancroft reported to the state's attorney just prior to trial that Albert was in a sufficiently good state of mental health to be tried for his crime and to testify. Albert, in Dr. Bancroft's opinion, was capable of understanding an oath and had the mental capacity to receive facts and incidents that he had heard and to narrate them at a later date. Dr. Bancroft's conclusion was that Albert developed an acute psychotic reaction at some time after beginning his prison term. Dr. Bancroft also concluded that Albert's hearing voices and hearing noises on records, at the jail, were hallucinations and

that for a time while Albert was there he had a psychosis.

At the request of the state's attorney, Dr. Otto G. Wiedman, in company with Dr. Bancroft, examined Albert at the jail and at the Norwich State Hospital. Dr. Wiedman stated that on February 5, 1951, Albert was mentally ill and that on that date he certainly would have doubted that Albert could understand an oath and narrate facts and be qualified as a witness. Dr. Wiedman added that this might or might not be so when Albert testified in May—if he was in a period of remission, he could testify, but not if he was in a period of psychosis. A person who is experiencing hallucinations and delusions cannot be relied on for the truth of his statements to the same extent as a normal person. At Norwich Albert's memory was adequate, Dr. Wiedman said. He agreed with the hospital diagnosis of schizophrenia, paranoid type. This disease may not affect the memory in its early stages.

Albert told the same story of the crime as he testified to in court to Drs. Bancroft and Wiedman at the jail and again at Norwich. He also told it to Dr. Priddy at the prison and to Dr. Carbone at Norwich, although later at Norwich he appeared to be attempting to exonerate his brother.

To review this summary: All the psychiatrists agreed that Albert was suffering from schizophrenia when he was transferred to the Norwich State Hospital on September 19, 1951. There was testimony that he had psychotic symptoms throughout his stay in jail from January 26 to June 19, 1951. One psychiatrist, only, expressed the definite opinion that Albert was competent to testify at the time of the trial of Joseph in May, 1951. Two psychiatrists definitely stated that he was not competent to testify,

and another, a state's witness, manifested great doubt. The doctor at the jail, the psychiatrist at the prison and the psychiatrist at the Norwich State Hospital all expressed the opinion that Albert was suffering from schizophrenia to some degree in the four-month period preceding the trial.

The question of Albert's competency to testify was a preliminary question to be decided by the court. *Holcomb* v. *Holcomb,* 28 Conn. 177, 179. The modern tendency is to avoid treating insanity as a cause of total incompetency, except in extreme cases, and to admit the person as a witness, leaving the defect in question to have whatever weight it deserves as discrediting the witness' powers of observation, recollection or communication. 3 Wigmore, Evidence (3d Ed.) § 931. If the court, after a proper consideration of the evidence as to Albert's sanity, were to admit his testimony, the evidence of his mental condition before, at and after the occurrence of March 23, 1950, and at the time of trial would be available for the jury to use in passing on his credibility. *United States* v. *Hiss,* 88 F. Sup. 559; *Bouldin* v. *State,* 87 Tex. Crim. 419, 423, 222 S.W. 555; *Fairchild* v. *Bascomb,* 35 Vt. 398, 417; *Ellarson* v. *Ellarson,* 198 App. Div. 103, 190 N.Y.S. 6, 10; *Alleman* v. *Stepp,* 52 Iowa 626, 627, 3 N.W. 636; 58 Am. Jur. 378, § 699; note, 15 A.L.R. 932; see *Tuttle* v. *Russell,* 2 Day 201, 202. And there can be little doubt that psychiatric testimony is admissible to impeach credibility. *United States* v. *Hiss,* supra, and authorities cited. Further, since a condition of mental disease is always a more or less continuous one, it would be proper, in order to ascertain the fact of its existence at a certain time, to consider its existence at a subsequent time. 2 Wigmore, Evidence (3d Ed.) § 233(3). Thus, upon a new trial

the undoubted insanity of Albert shortly after the original trial would be admissible and relevant upon the question of credibility.

None of the significant evidence summarized above was presented, and some of it was not available, at the trial on the indictment, to challenge the competency of Albert to testify or to affect his credibility. At that trial, before any evidence was offered, the defendant moved that the court order that Albert be subjected to a mental examination. The motion was properly denied on the ground that there was then no indication before the court that Albert was insane and also that, at least until he was actually offered as a witness, the court had no power to compel him to submit to such an examination. *State* v. *Taborsky*, 139 Conn. 475, 485, 95 A.2d 59. The motion was not renewed by the defendant at the proper time, that is, when Albert was called as a witness. Id., 486; *Holcomb* v. *Holcomb*, 28 Conn. 177, 179. We will comment upon this failure later in our discussion of due diligence. The point now is that the court in the murder trial of Joseph never had the question of the competency of Albert properly presented to it. And in that trial, the jury never had the facts now available concerning the sanity of Albert to weigh and to assist them in determining the credence they should give to his vital testimony.

The trial court in this petition for a new trial was not called upon to determine Albert's sanity at the time he testified, or to make a ruling upon conflicting medical opinion. Its function was to evaluate the effect which this testimony would have upon the court in ruling as to Albert's competency to testify and, assuming that his testimony were allowed, the effect the new evidence would

have upon the jury in rendering their verdict.

It must constantly be borne in mind that to convict, the jury would have to believe that Joseph was proven guilty beyond a reasonable doubt. A reading of the transcript of the original trial discloses that the determination of this question must have been a difficult one. Albert's story of what happened on the night of March 23, 1950, was inconsistent in many respects with the testimony of other witnesses. Joseph's story was substantiated by the testimony of his sister and Mrs. Pedemonti. The description given by the victim of his assailant was radically different from the appearance of Joseph. The jury, nevertheless, accepted Albert's testimony and rejected that of Joseph. They deliberated from 11:15 a.m. to 8:25 p.m.

The evidence now available as to Albert's sanity could have a persuasive influence upon the jury. In the shadowy area where proof which is insufficient to establish guilt beyond a reasonable doubt merges into proof which is sufficient to establish guilt beyond a reasonable doubt, the new evidence, and especially that of Albert's undoubted and incurable insanity as revealed shortly after the trial, might well be "sufficient to turn the cause in favor of the applicant." *Apter* v. *Jordan,* 94 Conn. 139, 141, 108 A. 548, quoting from 1 Swift's Digest 786. We conclude that the court was in error in holding that there is not a reasonable probability that upon a new trial the newly discovered evidence would bring about a different result. We further conclude that an injustice was done in that Joseph Taborsky was convicted without having the benefit of the newly discovered evidence in challenging the competency of Albert to the court and his credibility to the jury.

It is true that a new trial will not ordinarily be

granted because of additional impeaching or discrediting testimony. *Smith* v. *State,* 139 Conn. 249, 251, 93 A.2d 296; *Dortch* v. *State,* 142 Conn. 18, 27, 110 A.2d 471. This is not, however, a case where the new evidence consists merely of a recantation by one of the state's witnesses, as in the *Smith* case, supra, or where statements by a witness out of court variant with his testimony in court are presented, as, in *Apter* v. *Jordan,* 94 Conn. 139, 143, 108 A. 548, and *Husted* v. *Mead,* 58 Conn. 55, 61, 19 A. 233, or where the new evidence impeaches the general reputation of a witness. See *Apter* v. *Jordan,* supra, 142. In the present case, the impeaching testimony is much more fundamental. It goes to the very sanity of the key witness, without whose evidence the accused could not have been convicted. The prohibition is not applicable, where, as here, the impeaching testimony is of such importance that it appears reasonably certain that an injustice has been done and that the result of a new trial would probably be different. *Husted* v. *Mead,* supra, 64; *Apter* v. *Jordan,* supra, 143.

There was a lack of due diligence in the failure of the present plaintiff to challenge the competency of Albert to testify at the proper time in the original trial. Had this been done, Albert's mental condition could have been determined at a most opportune moment. There was also a lack of due diligence in the failure to discover and produce the evidence of Albert's psychotic conduct while he was in jail prior to trial and theretofore. But the plaintiff and his counsel could, of course, have had no knowledge of the significant fact of Albert's undoubted insanity subsequent to the trial and its important bearing upon his condition at and previous to the trial. A new trial will not be denied the plaintiff because of

his failure to exercise due diligence in the discovery of only part of the newly discovered evidence, when the remainder, which he could not possibly have discovered, is of such great moment.

In an apparent effort to shift to the state the responsibility for the failure to produce evidence of Albert's insanity at the trial, counsel for the plaintiff in their brief claim that the state failed in its duty of disclosing vital evidence to the court. Without going into details, we may state emphatically that this charge is wholly without justification. Throughout the trial and previous thereto, the state's attorney discharged his duties in accordance with the highest traditions of the office. In his effort to be fair in every way with the accused, he even permitted evidence important to the defense to come in when, by resort to a technical rule of evidence, he might have had it excluded. *State* v. *Taborsky,* 139 Conn. 475, 481, 95 A.2d 59.

While there was an attempt to attack Albert's credibility, if not his sanity, on cross-examination and by testimony from his mother, his sisters and Joseph, the newly discovered evidence is not of the same character or to the same facts. It was, therefore, not cumulative within the rule. *Waller* v. *Graves,* 20 Conn. 305, 310. At the original trial, there was no distinguished psychiatric testimony, no positive evidence of hallucinations and delusions in jail, and no evidence, of course, of Albert's insanity subsequent to the trial. In any event, a new trial will be granted when it appears reasonably certain that an injustice has been done and that the result of a new trial will be different, although the evidence supporting the petition for a new trial is cumulative. *Gonirenki* v. *American Steel & Wire Co.,* 106 Conn. 1, 12, 137 A. 26.

There is error, the judgment is set aside and the case is remanded with direction to render judgment granting the petition for a new trial.

In this opinion the other judges concurred.